## THE CITY OF CHICAGO

*v.*

### JULIAN S. RUMSEY.

1. BOUNDARY—*whether conveyance of lot on street carries any interest therein.* Notwithstanding the general presumption that a conveyance of land bounded on a street or highway carries the fee in the street or highway to the center thereof, the owner may convey the adjoining land without the soil under the street or highway. It is but a presumption, that may be rebutted by circumstances inconsistent with it. If it does pass by a deed, it does so as a parcel of the land and not as an appurtenant.

2. Where a lot on a street is conveyed, and the same is described as "beginning at a point on the east line of" the lot, which is given by number, "one hundred and forty feet from the north-east corner of said lot, running thence south along the line of said lot to the alley, thence west seventy-two feet, thence north forty feet, more or less, to a point, and west of the point of beginning, thence east to the place of beginning," the fixing the boundary in such strict terms necessarily excludes any presumption of intention to pass any interest in the soil.

3. USE OF STREET *under municipal direction — injury to adjacent owners.* The fee of the soil in the streets in the original town of Chicago, laid off by the canal commissioners under the provisions of law, is either in the State or in the city, for the use of the public generally, and it was competent for the city, under legislative authority of the State, to construct a tunnel in one of the streets, and if done in a proper manner, and without unreasonable delay, no action lies against the city in favor of an adjoining lot owner, whose property has received no physical injury.

4. From the well established policy of the State legislature to vest the fee of the streets in the various municipal authorities, it would require clear and satisfactory proof that the State intended to vest a private ownership in the streets in cities and towns laid out by it. If the fee is in the corporation, it is only as an agency, and is at all times subject to legislative control.

5.   Where the fee in the streets of a city is in the municipality or in the State, and not in an adjoining lot owner, the city is not liable, under the old constitution, to such owner for damages claimed on account of constructing a tunnel in the street in front of his property, when the work is properly planned and executed, under the sanction of law, and no physical injury is done to his property, and there is enough of the street left for passage and ordinary travel.

6.   TOWN PLAT—*in addition by State need not be acknowledged to pass fee in street.* The act of 1833, in relation to the laying out of towns, or additions thereto, and requiring the same to be acknowledged, etc., under severe penalties, does not apply to cases where the State lays out a town, etc., on lands to which it holds the legal title.   The State, in her sovereign capacity, may properly lay out a town without regard to the law prescribed for others.

7.   CONSTITUTION—*to be construed as acting prospectively.*   The rule of construction is, that a constitution, unless it is clearly otherwise expressed in the instrument, can operate only prospectively, leaving all past transactions unaffected by its provisions.   The present constitution expressly saves, preserves and continues all prior rights, etc., as they were before its adoption.

8.   SAME—*clause giving compensation for damage to private property, prospective.* The clause of the constitution of 1870, which provides that private property shall not be taken or damaged for public use without just compensation, does not profess to be retroactive, and but simply to take effect with the remaining clauses. Therefore, when a public improvement in a street was contracted for, the work commenced and mostly completed when the constitution took effect, but completed afterwards, it was *held*, as to an adjoining lot owner, whose lot was not taken, the rights of the parties could not be affected by the constitutional provision.

APPEAL from the Circuit Court of Cook county; the Hon. JOHN G. ROGERS, Judge, presiding.

Messrs. TULEY, STILES & LEWIS, and Mr. FRANCIS ADAMS, for the appellant.

Messrs. McCAGG, CULVER & BUTLER, for the appellee.

Mr. CHIEF JUSTICE SCHOLFIELD delivered the opinion of the Court:

This is an action on the case, by Julian S. Rumsey against the City of Chicago, for damages alleged to have been sustained to real estate in consequence of the construction of a tunnel under the Chicago river, in LaSalle street.

The city was empowered, by legislative authority, to construct the tunnel. An ordinance directing its construction was duly adopted by the common council, and the work was done by a contractor, pursuant to plans, profiles and specifications of the city, and under the direction and supervision of its engineer, with all reasonable dispatch, skill and care. No claim is made that Rumsey was injured by the manner in which the work was done, or that his property sustained any direct physical injury by reason of the construction. The right to recover is based solely upon a claimed reduction of the market value of his property, and loss of rents, because of the obstruction to the adjacent street, by the mere act of constructing the tunnel therein.

Before the construction of the tunnel, La Salle street was eighty feet in width, of which, sixteen feet in width, adjoining to Rumsey's property, was devoted to a sidewalk. In constructing the tunnel, this sidewalk was narrowed to eight feet in width. About twenty feet of the central part of the street is occupied by the tunnel, leaving upon each side of it about sixteen feet in width of the street, in addition to the sidewalks, unaffected, and used for street purposes, the same as before the construction of the tunnel. Opposite this property, the tunnel is from twelve to fifteen feet in depth, but is guarded by parapet walls, rising to a sufficient heighth for that purpose above the grade of the street.

The tunnel is for the accommodation of all travel to which an ordinary street is appropriate, and supplies the place of a bridge for passage from one side of the river to the other. There is no claim that it is improperly constructed, as respects engineering or workmanship, nor that the street has not been kept in a proper state of repair, as improved by the tunnel, nor that it has been or is the cause of any direct physical injury to Rumsey's property. Access is still afforded the property, on the side adjacent to La Salle street, by the eight feet sidewalk and the sixteen feet of street unaffected by the tunnel, but it is impossible to pass from it directly across the street,

in consequence of the tunnel and its protecting parapet walls. Rumsey had judgment for $19,000, and the record is brought here by the appeal of the city.

We shall endeavor to limit what we may say to the case actually presented by the record; and, in the view that we take of it, it will, therefore, be necessary to determine, first, in whom was the fee of the street, at the point affected by the controversy; and, secondly, is the damage complained of to be regarded as caused by the city before or subsequent to the adoption of the present constitution.

1st. Rumsey holds possession of the property under a deed executed on the 25th of February, 1854, conveying it to him by this description: "Beginning at a point on the east line of lot one, in block thirty-three, original town of Chicago, one hundred and forty feet from the north-east corner of said lot, running thence south along the line of said lot to the alley, thence west seventy-two feet, thence north forty feet, more or less, to a point, and west of the point of beginning, thence east to the place of beginning."

It would, therefore, seem that he could have had no reversionary right in the soil of the street, for an injury for which he might recover, whether the fee in the street was in the city or in some other party; for, notwithstanding the general presumption that a conveyance bounded on a street or highway carries the fee in the street or highway to the center, the owner may convey the adjoining land without the soil under the street or highway, or the soil under the street or highway without the adjoining land. "If the soil under the street or highway passes by a deed of the adjoining land, it passes as parcel of the land, and not as an appurtenant." Here the boundary is fixed by such express terms as necessarily exclude any presumption that it was intended to pass any interest in the soil under the street. 3 Kent's Com. (8 ed.) 534; *Gebhardt* v. *Reeves*, 75 Ill. 307; *Helm* v. *Webster*, 85 id. 116.

But it is unnecessary to lay much stress upon this view.

We are satisfied that the fee of La Salle street, adjacent to Rumsey's property, is either in the State or the city of Chicago, for the use of the public, and, therefore, Rumsey can have no legal interest in it, except in common with the public.

The portion of the city of Chicago in which Rumsey's property is located was laid out by Wm. F. Thornton, W. B. Archer and G. S. Hubbard, commissioners of the Illinois and Michigan Canal; and the first sale of lots commenced on the 20th day of June, 1836. The land was donated to the State by act of Congress approved March 2, 1827, subject to the disposal of the legislature, to aid "in opening a canal to unite the waters of the Illinois river with those of Lake Michigan;" and power was given the State to sell and convey the whole or any part of the lands so donated, and to give titles in fee simple therefor. There can be no question but that this donation, when accepted, vested the State with all the title the general government had to these lands; in other words, invested it with the highest title known to our law—an absolute fee simple title.

By the 22d section of an act of the General Assembly, approved January 9, 1836, entitled "An act for the construction of the Illinois and Michigan Canal," it was made the duty of the board of commissioners of the Illinois and Michigan Canal to "examine the whole canal route, and select such places thereon as may be eligible for town sites, and cause the same to be laid off into town lots;" and they were directed to cause the canal lands in or near Chicago, suitable therefor, to be laid off into town lots. The 23d section contains this language: "And the said board of canal commissioners shall, on the 20th day of June next, proceed to sell the lots in the town of Chicago, * * * * as also fractional section 15, adjoining the town of Chicago, it being first laid off and subdivided into town lots, streets and alleys, as, in their best judgment, will best promote the interests of said canal fund."

Title to the purchaser at such sale, it is provided by the

27th section, shall be conveyed by patent, signed by the Governor and countersigned by the Secretary of State, with the seal of the State annexed.

The 13th section of an act to amend the act last referred to, approved March 2, 1837, requires the commissioners elected under that act to cause the plats of the towns of Chicago and Ottawa, by which they were governed in selling lots in said towns, to be recorded, with the certificates of the late canal commissioners endorsed thereon as to the identity of the plats; and provides that "the plats of said towns, or certified copies thereof, shall be admitted as evidence in all courts or places whatsoever."

. The plat of the town of Chicago, of which a copy is in evidence, is certified by "Wm. F. Thornton, W. B. Archer and G. S. Hubbard, late commissioners of the Illinois and Michigan Canal," as "the identical map by which they were governed in selling lots belonging to said town on the 20th and following days of June last past;" and is dated on the 22d of May, 1837, and filed for record on the 29th of the same month.

It does not seem to be controverted that this plat is evidence of all that it shows upon its face—that is, the location, names, and width of the streets, and the location, size and numbers of the lots and blocks. But the point is made that, not being acknowledged in conformity with the statute of 1833, it does not convey a fee simple title in the streets to the town, as it is held, the acknowledgment of plats in conformity with that statute does. *Trustees* v. *Haven,* 11 Ill. 554; *Hunter* v. *Middleton,* 13 id. 50; *Manly* v. *Gibson,* id. 308; *Leech* v. *Waugh,* 24 id. 228.

Had the land, where the town was laid out, belonged to a party other than the State; or, possibly, had the legal title been conveyed to a trustee or trustees for the use of the State, the point would have been well taken. But, as we have seen, the land where these lots were laid off belonged to the State. The legal title was not held in the name of a trustee, but by the

State; and the lots were conveyed by patent issuing from the chief executive officer of the State,—in all material respects similar to patents conveying lands from the general government.

The statute of 1833, (Rev. Stat. of 1833, p. 599,) embraces almost every conceivable authority, other than the State, by which a town or an addition thereto can be laid out, and enjoins, by severe penalties, conformity with its provisions. But the State is not included within its provisions, and there is no need it should be. Being sovereign, and capable of acting in that respect only through its law-making power, in determining to lay out a town or an addition thereto, the law by which it is caused to be done must necessarily prescribe what shall constitute such laying out.

But the statute of 1833 has one very important bearing upon the question. It shows that it was the policy of the State to so vest the fee of streets in cities, towns, etc., that it should be under the paramount control of the legislature, for the public use, divested of all claims of private ownership. This being the declared policy of the State, the presumption would follow that no discrimination in this regard should exist between cities, towns, etc., laid out by the State, and those laid out by other proprietors—and it would require clear and satisfactory proof that the State intended to vest a private ownership in the soil under the streets in the cities and towns laid out by it, to induce in us the belief that it was actually designed to accomplish that result. A general policy being once established, it devolves upon those claiming exceptions to clearly show their existence. No reason is perceived why an exception should have been desirable, which would have left the legislature with less unquestioned authority to control the improvements of the streets for public purposes in the cities, towns, etc., of which the State is proprietor, than in others—and the circumstances connected with the sale and conveyance of the canal lots have no tendency to prove that such exception was intended. The commissioners had no

authority given them by the law to sell anything but lots, where towns were laid out; and the patent issued by the Governor could only include what the commissioners sold.

As has been seen by reference to 3 Kent's Com., *Gebhardt* v. *Reeves* and *Helm* v. *Webster, supra,* it is but a *presumption* that a conveyance of a lot bounded on a street or highway, carries title in the underlying soil to the center, which may be rebutted by circumstances; and, therefore, since the circumstances here are inconsistent with such presumption, it can not prevail.

We do not regard it of any practical importance whether it is more technically accurate to say the fee of this street is in the State, or in the city. If it shall be said to be in the corporation, there can be no pretense for saying that it is in it otherwise than as an agency—a mere creature of the State—existing only by authority of the legislature, and, at all times, under its paramount supervision and control, and if it shall be said to be in the State, it can only be said to be there for the purpose of holding it for a street of the city—and, in either case, the sole purpose and end to be attained is precisely the same,— the holding it for the uses of a street of the city for the benefit of the public—not the citizens of the city alone, but the entire public of which the legislature is the representative. There could, therefore, be no necessity for any formal act of conveyance or dedication of the fee; it was already as completely under the paramount authority and control of the legislature as it could possibly be for the purposes of a street, and no conveyance or formal act of dedication by the State to the municipality, could have vested it with a more exclusive interest in or control over the street, than was done by the act of the legislature directing it to be laid out as such. Cities, towns, etc., possess and can exercise only such authority and control in regard to their streets as may be delegated by the legislature. They have no inherent power or authority in this respect, and can act only in subordination to the paramount authority of the legislature. If we could see that it was at all material, we

should say the act of the legislature directing the laying out of the streets on its own land, was a sufficient dedication of the fee to the local municipality.

It follows that, the fee of the streets being so held, private owners could have no more right to complain of improvements made therein by the city under the authority of the legislature, than of improvements so made in streets, the fee whereof is vested in the city by act of dedication in conformity with the provisions of the statute of 1833; and that what might lawfully be done by the city, under the authority of the legislature, notwithstanding its effect upon adjacent property owners, in the one case, might also be done in the other; so that there can be no different measure of liability in that regard.

2d. The construction of the tunnel was authorized by an act of the General Assembly approved Feb. 15, 1865; and the ordinance of the city council, directing its construction, was adopted on the 16th of August, 1869. No question is made upon either the act of the General Assembly or the city ordinance. They fully authorized all that was done, and there is no necessity to make further special reference to their provisions. The contract for the construction of the tunnel was made on the 20th of October, 1869, and it required that the work should be commenced on or before the 1st of November, 1869, and completed on or before the 1st of July, 1871.

The work was commenced on the 3d of November, 1869, in the center of Chicago river, which, as appears from the evidence, is some two blocks, or perhaps a little more, north of Rumsey's property. From the point of commencement, the work was prosecuted northward, and that part of the tunnel was completed and work commenced on the south part of the tunnel by the 8th of October, 1870. The work opposite Rumsey's property was done between May 1st and October 3d, 1871. The work on the tunnel alone was completed by July 1st, 1871, but the work of paving the street, etc., was not completed until the 3d of October following. After the commencement of the work of construction, on the 3d of Novem-

ber, 1869, it was continuously prosecuted until its completion. The present constitution took effect on the 8th of August, 1870. It is unnecessary to inquire to what extent the rights and obligations existing by virtue of contracts made prior to the adoption of a constitution may be affected or changed by its provisions, when its language clearly professes to include such contracts, for the rule of construction is that a constitution, unless it is otherwise clearly expressed in the instrument, can act prospectively, only, and all past transactions are unaffected by it. Cooley's Const. Limitations (1st ed.), 62–3. And section 13 of article 2 of the present constitution, which provides that "private property shall not be taken or damaged for public use without just compensation," does not profess to be retroactive, but simply to take effect with the remaining clauses of the constitution, and to prescribe the rule under which property may be thereafter taken and damaged for public use. Rumsey, therefore, can base no right of recovery on this clause of the constitution, for damages which he had sustained prior to the 8th of August, 1870, in any view.

Counsel, however, insist that Rumsey's property was not damaged until after the work was done opposite it, in the spring of 1871.

This position is neither consistent with the character of the improvement, nor borne out by the evidence.

The testimony of Rumsey himself shows that his greatest loss of rents was for the year May, 1870, to May, 1871. The renting was from the 1st of May each year, the contracts therefor being made at or prior to that date. He says, May, 1869, to May, 1870, his rents were $8,488.67; May, 1870, to May, 1871, $4,972. In October, 1871, his building was destroyed by the great fire; but his rents, up to that time, were at the rate of $5,600 for the year May, 1871, to May, 1872; and he further says, the tunnel interfered most with the renting of his property in the spring of 1870. On what theory can it be said this loss of rents was not just as much the subject of a recovery, if a recovery could be had for it at all, immediately

after it was sustained, and before the adoption of the constitution, as in 1874? We know of none, and the evidence was given to the jury, and doubtless had its effect in fixing the amount of the verdict, upon the hypothesis that it proved damages sustained by Rumsey in May, 1870, and thence continuously.

The construction of the tunnel, so far as the city is concerned, should be regarded as a single act; and, in point of fact, it is in this view, as we think, Rumsey claims to have been injured by it. It is not the last work any more than the first,—not the digging, dredging or masonry work, at any one particular time or place, which he claims permanently reduced the value of the property—but the entire work—the construction of the tunnel.

So far as the city caused or could cause this act to be done, it did so, not only before the adoption of the present constitution, but even before the delegates were elected who framed that instrument. Its ordinance was adopted, its plans, profiles and specifications prepared, and its contract entered into, for the construction of the tunnel, and the contractor had entered upon his work, by the 3d of November, 1869. There is no pretense for saying the construction of the tunnel was caused by any act of the city done after that time. The contractor was allowed until July 1st, 1871, to perform his contract, but he was at liberty to complete it as much sooner as he could. Had he completed it on or prior to the 8th of August, 1870, no one could claim that the constitution of 1870 had any bearing upon the case. But can it be reasonably insisted that the mere time of the completion of a single, entire improvement, already entered upon, makes any difference? A law or constitution requiring the suspension of performance already commenced, of a contract, or the imposing additional restrictions and obligations upon one or both of the parties to it, in its further performance, is necessarily retroactive. It obliterates past rights and obligations, and imposes new ones, and materially changes the relations of the parties. When the city

adopted its ordinance, directing the construction of its tunnel, and made its contract therefor with the contractor, the constitution did not prohibit it from damaging private property for public use without just compensation. Its contract for construction was, then, lawful, although no provision was made against damaging private property, and what damage might be done to private property had not been ascertained and just compensation therefor provided. The contractor, then, might lawfully go forward and perform his part of the contract, and insist upon its full performance on the part of the city. If the present constitution, however, affects that contract, the moment it became operative what was before lawful became unlawful. A contract which could have been performed by the contractor without incurring the liability of a *tort feasor,* became impossible of performance without incurring that liability; for, if the city is liable to adjacent property holders by reason of the construction of the tunnel, it is because of the tort it has committed through the contractor in constructing it; and, as between those who commit torts and those who cause them to be committed, there is no difference—all are equally liable, and the injured party may elect whom he will sue—one or all. Whether, in this case, the construction of the tunnel had been suspended at the moment the constitution took effect, or prosecuted to completion as it was, if it was affected by the constitution, it is obvious the rights of the parties were materially changed; the tax-payers of the city made to bear a burden, either in the loss of money already expended in the work, or in paying for damages not within legal contemplation when the contract for construction was made, and the contractor made to lose either the profits to result from his completion of the performance of the contract, or to incur the risk, by performing it, of being held liable to property holders for damages not within the contemplation of his contract when he entered into it. That this would be to give the constitution a retroactive effect, can admit of no dispute. Smith on

Statutory and Constitutional Construction, p. 289, § 149; Sedgwick on Statutory and Const'l Law, p. 188.

Moreover, it is expressly provided by § 1 of the Schedule to the Constitution, " That all laws in force at the adoption of this constitution, not inconsistent therewith, *and all rights, actions, prosecutions, claims and contracts of this State, individuals, or bodies corporate, shall continue to be as valid as if this constitution had not been adopted.*"

This language is surely comprehensive enough to include the contract and rights of the city and the contractor, and we perceive no reason why it should be narrowed by a strained construction so as to exclude them.

We doubt not that municipalities might have been compelled, by a clause in the constitution expressly relating to contracts and transactions prior to its adoption, to have borne burdens of the character here sought to be imposed, but, in our opinion, it would have required far different phraseology from that to be found in the constitution as it is.

We must hold that the rights of the parties involved in this litigation are not affected by the present constitution.

3d.   It remains only to inquire whether the evidence in this record shows a case, under the law as it was construed prior to the adoption of the present constitution, in which there is a right of recovery—the fee of the street being in the State or city, under the paramount control of the legislature, for the use of the public; and it will, therefore, be unimportant what might be our views did Rumsey have the fee in the soil, under the street, to its center, or if the case were one in which the present constitution might be resorted to in ascertaining the extent or character of his rights.

The case is not analogous to *Nevins* v. *Peoria*, 41 Ill. 502, and other cases resting upon the principle there announced. There was here, as has been shown, no direct act of physical injury to Rumsey's property, either intentionally or negligently,—the only act claimed to constitute an injury being, the construction of the tunnel in the street adjacent to his property. That

it was done pursuant to appropriate legislative authority, is conceded; and it is likewise tacitly, if not directly, conceded that the design and manner of constructing the tunnel are free of objection. The street adjacent to Rumsey's property is not destroyed; it is simply narrowed, and rendered less convenient and desirable for some special purposes, in consequence, than it was before. The doctrine was laid down in *Moses et al.* v. *Pittsburgh, Fort Wayne and Chicago Railroad Co.* 21 Ill. 516, that the fee of the street being in the city, the city (having legislative authority therefor) might authorize the location of a railroad in the street without incurring any liability for consequential damages to adjacent property holders; and it was supported by this reasoning: "It must necessarily happen that streets will be used for various legitimate purposes, which will, to a greater or less extent, discommode persons residing or doing business upon them, and just to that extent damage their property, and for it a party can claim no remedy. The common council may appoint certain localities where hacks and drays shall stand waiting for employment, or where wagons loaded with hay or wood, or other commodities, shall stand waiting for purchasers. This may drive customers away from shops or stores in the vicinity, and yet there is no remedy for the damages. A street is made for the passage of persons and property, and the law can not define what exclusive means of transportation and passage shall be used. Universal experience shows that this can best be left to the determination of the municipal authorities, who are supposed to be best acquainted with the wants and necessities of the citizens generally. To say that a new mode of passage shall be banished from the streets, no matter how much the general good may require it, simply because streets were not so used in the days of Blackstone, would hardly comport with the advancement and enlightenment of the present age."

*Murphy* v. *Chicago*, 29 Ill. 279, was an action on the case, against the city, for allowing a railroad company to occupy a street adjacent to the plaintiff's property with its track; and

it was charged that the company, in preparing its track, erected permanent walls and embankments on the surface of the street, twenty-three feet high, and thereby all access from Lake or Randolph streets to that street (except down a flight of stairs) was cut off, and that plaintiff's use of that street was wholly cut off and destroyed. The court held there was no cause of action, and, among other things, observed: "It is the settled law of this court, as well as in most of the other States of this Union, that it is a legitimate use of a street or highway to allow a track to be laid down in it; and for doing so, the city is not liable for any damages which may accrue to individuals. Cases are constantly occurring where individuals are incommoded, and thus really damaged in this way, for which the law can afford no remedy."

*Roberts* v. *Chicago*, 26 Ill. 249, was an action on the case, against the city, for raising the grade of the street, in front of plaintiff's property, four feet above the grade, so as completely to block up and destroy access to his property, in consequence whereof plaintiff was put to large expense in raising his building to the level of the street, and was otherwise injured. The court held this afforded no cause of action, and said: "We recognize unhesitatingly as sound law, that the city has the right to establish and change the grade of the streets, and to compel the owners of lots to grade the streets accordingly; * * * * and when a grade is established or altered in good faith, with the purpose of improving the streets, the courts will not inquire whether it is the very best grade which could have been adopted."

In *Nevins* v. *Peoria, supra,* the *gist* of the action was, that the employees of the city, in building a grade or embankment in the street, turned a stream of mud and water upon the plaintiff's property. This was a direct physical injury, for which it was held there could be a recovery. But the court very carefully distinguished it from a case where the injury complained of results solely from the character of the improvement in the street, and not in consequence of a direct

manual interference with property; and said: "A city owns the streets, for the use of the public, and has the right to grade them in any manner the representatives of the public may deem conducive to its interests. It is not liable for errors of judgment, and if, in the process of grading, it leaves private property many feet below or many feet above the surface of the street, it is free from all claim of damages on this account, for precisely the same reason that a private person is exempt under similar circumstances."

*The City of Aurora* v. *Gillett et al.* 56 Ill. 132, and *The City of Aurora* v. *Reed,* 57 id. 29, are based upon the principle announced in the *Nevins case. The City of Pekin* v. *Brereton,* 67 Ill. 477, *City of Pekin* v. *Winkel,* 77 id. 56, *City of Bloomington* v. *Brokaw,* id. 194, and other cases of kindred character since decided, arose under the present constitution, and therefore deserve no comment.

In *City of Quincy* v. *Jones,* 76 Ill. 231, the cause of action arose before the adoption of the present constitution; and it was there held, there could be no recovery for an excavation in a street, which, by its proximity to the plaintiff's house, rendered it necessary that the house should, for safety, be removed.

In the more recent cases of *Stone* v. *Fairbury, Pontiac and Northwestern Railroad Co.* 68 Ill. 394, *Stetson* v. *The Chicago and Evanston Railroad Co.* 75 id. 74, and *Chicago, Burlington and Quincy Railroad Co.* v. *McGinnis,* 79 id. 269, it is shown that the doctrine in the cases of *Moses* v. *The Pittsburgh, Fort Wayne and Chicago Railroad Co., Roberts* v. *Chicago,* and *Murphy* v. *Chicago, supra,* holding that there can be no recovery by an adjacent property holder on streets, the fee whereof is in the city, for the merely consequential damages resulting from the character of the improvement made in the streets, provided such improvement has the sanction of the legislature, is regarded by this court as having been the settled law of the State, at least up to the time of the adoption of the present constitution. How the law may have been held elsewhere, or

since that time, is, therefore, of no consequence to the present inquiry. There can be no pretense that tunnels may not often be not only convenient, but even necessary to facilitate passage in the streets of large commercial cities; and whether this one was necessary for that purpose, was a question left solely to the determination of the common council, which does not admit of judicial review.

There is no principle upon which the right to locate a railroad upon a street, as a legitimate use of the street, can be sanctioned which will not also sanction the construction of a tunnel in a street. The tunnel does not change the character of the street or apply it to a new use. It imposes no new servitude, and is for the convenience of passage by the ordinary modes of travel in a street. Its inconvenience, and the only cause of its injury to adjacent property holders, is in the fact that it necessitates excavations and embankments, and thereby obstructs or incommodes passage from the one side of the street to the other. This is also, however, quite frequently, if not universally, the case where railroads are located in the streets, and sometimes by the mere change of the grade in the street; and where there can be no recovery for damages sustained by these improvements, it is impossible there can be for the simple act of construction of a tunnel, which produces precisely the same injury.

We are of opinion the facts disclose no cause of action, under the law applicable to them, and the judgment must therefore be reversed.

*Judgment reversed.*