*(Circuit Court of Cook County. In Chancery.)*

## Daggett

### vs.

## City of Chicago, et al.

(June 23, 1892.)

1. PLATS—EFFECT OF PLATTING AND DEDICATION OF STREET BY STATE AGENCY. By the platting of a subdivision and dedicating a street therein, the board of canal commissioners vested in the City of Chicago the title in fee of said street to be used as a public street for the benefit of the people at large.

2. ABUTTING OWNERS—STANDING IN EQUITY TO PREVENT DIVERSION OF USE OF A STREET OR PARK. An owner of property abutting upon a public street or park has a peculiar interest as such owner of property distinct from that of the public at large which entitles him to the aid of a court of equity to prevent the appropriation of such street or park to private uses or to any other public use distinct from that for which the same was dedicated.

3. SAME—WHERE DIVERSION BENEFITS INSTEAD OF INJURES COMPLAINANT. It is no defence to the bill of an abutting owner to prevent the diversion from its public use of a street or park upon which his land abuts, that such diversion will benefit instead of injure him.

4. LACHES—NEGLECT TO COME PROMPTLY INTO COURT—ALLOWING DEFENDANT TO EXPEND LARGE AMOUNT OF MONEY. When complainant has knowingly laid by and allowed the defendant to expend a large amount of money on a building in a public park as so authorized to do by the legislature he will be estopped in a court

of equity to insist upon an injunction to preserve such of his easements as he claims the building does or will interfere with, by his laches in not moving sooner.

5. INJUNCTION—DISCRETION OF COURT—BALANCE OF CONVENIENCE. The issuance or continuance of an injunction is to some extent a matter of discretion in the court and where the right infringed will create no irreparable injury or the injury is slight, that discretion is often exercised against the issuance of the writ. The court will balance the loss or inconvenience and if the issuing of the writ will cause much loss or inconvenience to the defendants, and but slight benefit to the complainant, it will refuse to use the court's strong arm to protect the complainant but will leave him to an action at law.

6. PARKS—PERSON IN POSSESSION UNDER VALID LEGISLATIVE ACT—PROVINCE OF COURT OF EQUITY—REMEDY FOR CONSEQUENTIAL DAMAGE. A party acting under legislative authority constitutionally exercised will not be interfered with in his possession at the suit of a private property owner who is consequently damaged by reason of such possession being taken and acts done under such legislative authority. It is not the province of a court of equity in such a case to interfere to thwart the legislative will, but the aggrieved party should be left to his remedy at law.

7. MUNICIPAL CORPORATIONS—PROPERTY HELD IN GOVERNMENTAL CAPACITY—CONTROL BY LEGISLATURE—POWER TO CHANGE USE. The legislature has full control over the streets and all the property of a municipality held in a governmental capacity and it has the power to change or alter the public use for which such property may be held in trust especially where such changed public use is of the same nature or kind.

8. PARKS—USE FOR PUBLIC PURPOSES—ERECTION OF ART GALLERIES. It is no perversion of the uses of a public park to erect a building therein devoted to art purposes filled with paintings and works of art designed to satisfy the aesthetic nature of the people who may visit the park.

9. SAME—CONTROL BY PRIVATE CORPORATION. The mere fact that an art gallery erected in a public park under the control of a private corporation, such corporation not being organized for pecuniary profit, does not detract from the public character of the erection where without cost to the city either in the original erection or the subsequent maintenance, the gallery is filled with art treasures and open to the public free of charge two full days each week together with holidays and Sundays.

Motion to dissolve or modify an injunction. Heard before Judges Tuley, Horton, Burroughs and Tuthill.

*S. K. Dow & J. Burnham,* for complainant.
*John S. Miller,* corporation counsel, for city of Chicago.
*John P. Wilson,* for Chicago Art Institute.
*Edwin Walker,* for World's Columbian Exposition.

TULEY, J. (HORTON and BURROUGHS, JJ., concurring) :—

We can not enter into an extended discussion of the many points arising in this case, and shall only notice such as we deem necessary for the determination of the present motion.

It appears that in 1836 the Board of Canal Commissioners, representing the state of Illinois, made a subdivision of fractional section 15, east of State street, and between Madison and Twelfth. By the plat of said subdivision, the west line of Michigan avenue, from Madison street to Twelfth street, was fixed as it is at present found. The land lying between that west line and Lake Michigan, from Madison street to Park Row, just north of Twelfth street, was marked on the plat as "Michigan avenue." The meandering line of the Lake Shore made said plat of ground called Michigan avenue irregular in width, varying from less than ninety feet in width in front of Adams street, to about 200 feet at Park Row.

The first question that arises, is what title or interest did the municipality of Chicago take in said land, lying between the west line of Michigan avenue and the lake shore. By the act of the canal commissioners making such plat and dedication, the city became vested with the title in fee of said street marked "Michigan avenue," in trust, to be used as a public street for the benefit of the public at large. It holds such fee in its governmental capacity as a state agency. This is clearly so held in the case of the *City of Chicago v. Rumsey,* 87 Ill. 348; and *Zinc Company v. La Salle,* 117 Ill. 411; *Stack v. East St. Louis,* 85 Ill. 377; *Lloyd v. Mayor,* 5 N. Y. 369; *West Chicago Park Board v. McMullen,* 134 Ill. 170.

The city of Chicago subsequently made said street between Park row and Madison street, by ordinance, ninety feet in width, and improved it as such, and for more than twenty-five years last past has treated the original, and made the land

lying east of said ninety foot street, and between said street and the right of way of the Illinois Central Railroad (which said right of way was distant from the said west line of Michigan avenue 400 feet) as a public park or open common, commonly known as Lake Park or the Lake Front.

It appears from the evidence that in 1873, the city of Chicago permitted the erection upon said land east of said 90 foot street of the building known as the Interstate Exposition Building, in which building there has been up to the year 1892 annual industrial exhibitions, horse shows, concerts and various amusements permitted. The city has also allowed and permitted the occupation of a portion of it as a public armory, and at no time since that date has it been free from buildings.

In the summer of 1889, one Warren F. Leland, owning property at the corner of Jackson street abutting on said Michigan avenue, filed the bill in this case on behalf of himself, and all other property owners similarly situated, seeking to restrain the city of Chicago and the Interstate Industrial Exposition from permitting any person or corporation to erect a building for an electrical plant, or any other structure on the said land east of Michigan avenue, and from allowing or giving license to any person to take possession of and occupy any portion of said land, and that upon the hearing the injunction might be made perpetual, and that the Exposition building then upon said land should by mandatory injunction be decreed to be removed. A temporary injunction was granted upon the recommendation of a master according to the prayer of the bill, which injunction the defendants, the said Art Institute, and the said World's Columbian Exposition now seek to have modified so as to permit the erection by the Art Institute and said World's Columbian Exposition of a permanent art building on the site formerly occupied by the said Interstate Exposition Building. The present complainant, Sarah E. Daggett, shortly after the commencement of said suit, became a co-complainant, and during the present month the said World's Columbian Exposition and the said

Art Institute have become co-defendants and filed their answers herein. Numerous affidavits have been read in support of the bill, and also in support of the answers.

It appears that, in the year 1890, the project of holding a World's Fair in Chicago in the years 1892 and 1893, was started, and the congress of the United States, by act of April 25th, of that year, provided for the celebration of the 400th anniversary of the discovery of America by holding a world's fair at the city of Chicago, with power to the commission thereby appointed to accept such site as might be selected and offered by a corporation organized under the laws of the state of Illinois now known as the World's Columbian Exposition. It appears that the "World's Exposition of 1892," now the "World's Columbian Exposition," was incorporated under a general law of the state of Illinois, on the 9th of April, 1890, with power providing for the holding of the world's fair in the city of Chicago, and preparing a site and constructing the necessary improvements and buildings thereon. It further appears that in August, 1890, at a special session of the legislature of the state of Illinois, a special act was passed entitled "An act in relation to the World's Columbian Exposition," in which, among other things, the authorities having in charge the management of said World's Fair were authorized to use and occupy all of said lands or rights therein of the state of Illinois, whether submerged or otherwise, within the present limits of the city of Chicago, or adjacent thereto, which might be designated and selected by such authorities as the site for holding said world's fair. Authority was also given to fill and reclaim lands adjacent to any site so selected, such submerged lands so filled and reclaimed to be maintained as a public park after they ceased to be used for the purpose of such world's fair.

The act clearly gave the power to the authorities having in charge the world's fair, the corporate authority of the city of Chicago consenting thereto, to take possession of that portion of the land so dedicated in 1836 as Michigan avenue, lying east of the present Michigan avenue, and commonly known as the

Lake Park, or Lake Front, and of all submerged lands adjacent thereto that might be necessary for the purposes of the fair, the submerged lands which might be filled and reclaimed to remain a part of the said public ground without prejudice to any private rights therein as the same existed prior to the passage of the act. This act contained the following proviso: "That the buildings erected upon said public ground, or any enlargement thereof, may be removed and disposed of by the authorities erecting the same, within one year from and after the close of said exposition unless otherwise arranged and agreed between the corporate authorities of said city of Chicago, and the authorities who erected the same; and if the said city of Chicago shall agree to purchase said buildings, said authorities shall not ask or obtain from said city for said buildings a sum greater than the actual cost of building the same." The act also authorized a proceeding by the attorney-general or the state's attorney of Cook county, upon the request of the authorities having charge of the said World's Columbian Exposition to apply to a court, and have any right of easement or interest of the abutting property owners condemned and compensation made therefor under the act concerning the right of the exercise of eminent domain, but that no such private right or easement of property owners should be condemned for a longer term than five years.

It appears that on the 15th day of September, 1890, the World's Columbian Exposition made application to the conporate authorities of the city of Chicago for permission to use the said land so dedicated and known as the Lake Park and the submerged land adjacent thereto for the purposes of said world's fair, or Columbian Exposition, and an ordinance was passed by the city of Chicago, granting the use of said Lake Park, commonly called Lake Front, for the purposes of the world's fair. The Columbian Exposition subsequently determined that the main site of the world's fair should be Jackson Park, but that it would erect an art building upon said Lake Front. It appears thereupon the Art Institute of

Chicago, a corporation organized not for pecuniary profit, proposed to the Columbian Exposition to unite in the construction of an art building to be erected on said Lake Front north of Jackson street, which, after the fair, might remain as a permanent memorial art building, the World's Columbian Exposition paying $200,000, which was the estimated cost of a temporary building, for that purpose, and the Art Institute providing the further sum of $400,000, making the cost of the permanent building $600,000. That the art building should be erected on the site then occupied by the "Interstate Industrial Exposition Building," which should be torn down and removed; the building so erected to be used by the World's Columbian Exposition for world's fair purposes, and to be under its control until the close of the world's fair. An agreement to that effect was entered into between the World's Columbian Exposition and the Art Institute, the Interstate Industrial Exposition consenting thereto.

At the time this proposition was made and accepted, it appears that the World's Columbian Exposition was in the possession and control of the Interstate Industrial Exposition Building, and of said Lake Park or Lake Front. It appears that on the 30th of March, 1891, the city of Chicago passed an ordinance, giving authority to the Art Institute of Chicago, to erect a permanent art building on the site of the former Interstate Exposition building, at its own cost, the title and ownership of the building to be vested in the city of Chicago, without any compensation being paid or allowed by the city to the World's Columbian Exposition, the Art Institute or any person or corporation therefor, and the use and occupation of said building when erected should be vested in the Art Institute of Chicago, and the objects for which the Art Institute was incorporated; that as soon as the World's Columbian Exposition should surrender the building, the Art Institute should transfer to the building, its museum, library and collections of art; that the exhibition halls of the building should be open to the public free of charge from nine o'clock till five o'clock on Wednesdays and Saturdays of each

week and on all legal and public holidays, and from one to five o'clock on each Sunday, and that all teachers and professors of the free public schools in said city of Chicago should be admitted to all the advantages afforded through its museum, library apparatus and collections or otherwise for study, research and investigation, free of any charge, the said art building to be managed, controlled, kept in repair, and carried on by said Art Institute without charge to the city of Chicago.

It appears that the officers of said Art Institute Association obtained the consent of all the owners of property abutting on said portion of Michigan avenue to the tearing down of the old exposition building and the erection thereon of the permanent art building, except the complainant, who owned a frontage of 65 feet in said half mile of frontage, and also one Stafford, who owned a reversion in a small lot after the expiration of a ninety-nine years' lease. The evidence tends to show that the officers and managers of said Art Institute were led to believe by the declarations of the husband of complainant (he assuming to act as her agent), that complainant would join with the other property owners and give such consent as they had done to the removal of the Interstate Exposition building and the erection of the art building. The removal of that exposition building was commenced about the month of November, 1891, and the contracts for the erection of the art building were entered into on the 4th of February, 1892.

It further appears that the complainant notified by letter, received on the 6th day of February, two days after the letting of said contracts, one of the directors of the said Art Institute, that she would not consent to the erection of a permanent art building upon said Lake Park, and that said director communicated such notice to the board of directors within a few days thereafter.

It appears by the evidence that no action was taken by complainant in court to prevent the continuation of the work being done by said Art Institute, by any motion, order, rule

for contempt or other proceeding until a large amount of money had been expended by said Art Institute; that the first action in court being taken by complainant on the 3d of April, 1892, by a rule to show cause made on the defendants therein why they should not be punished for contempt for violating the injunction of this court in proceeding to erect the said art building.

The evidence shows that complainant's property will not be damaged, but on the contrary will be largely benefited by the erection of said art building. We hold that an owner of property abutting upon Michigan avenue and this Lake Park has a peculiar interest as such owner of abutting property, distinct from that of the public at large, which entitled such owner to the aid of a court of equity to prevent the appropriation of such street or park to private uses, or to any other public use distinct from that for which the same was dedicated. That to a bill of such owner of abutting property, the defendants, whose acts are sought to be enjoined, can not defend upon the ground that their wrongful acts if they be such, will benefit instead of injure the complainant.

We hold that the evidence in this case tends to show some knowledge of the complainant of the acts of the defendants, the city of Chicago, the Art Institute, the Columbian Exposition and the Interstate Exposition, touching the removal of the old exposition building and the erection of said permanent art building, and that complainant has been guilty of *laches* in not moving sooner in court, so as to prevent the expenditure of money by the Art Institute. While such *laches* of complainant could not be held to be a waiver of any right to recover any damages that she may sustain as such abutting owner, it might be held to amount to an equitable estoppel upon her insisting upon the equity of an injunction against the Art Institute's further proceeding in the erection of the art building.

The issuing or continuing the writ of injunction is to some extent a matter of discretion of the court, and where the right infringed will create no irreparable injury, or the injury is

slight, that discretion is often exercised against the issuing of the writ of injunction. The court will balance the loss or inconvenience, and if the issuing of the writ will cause much loss or inconvenience to the defendants, and but slight to the complainant, it will refuse to use the court's strong arm to protect the complainant, but will leave him or her to an action of law.

The fact that the complainant has laid by and permitted the defendant, the Art Institute, to expend a large sum of money, which might have been prevented by diligent action of the complainant in court, should be a strong factor to determine the judgment of the court in the exercise of that discretion. We are not inclined to place our decision solely upon the question of *laches* of complainant.

The question arises in regard to the act of 1890, whether the legislature had the power to pass the act in question, and if the legislature had the power to authorize the Columbian Exposition with the consent of the city of Chicago, to take possession of this Lake Park, and use it for the public purposes of such world's fair, and for the purposes expressed in said act; and the defendants being in such possession and acting under the authority of the supreme court of the state, should a court of equity interfere with that possession by the issuing of its writ of injunction?

A party acting under legislative authority constitutionally exercised will not be interfered with in his possession at the suit of a private property owner who is only consequently damaged by reason of such possession being taken and acts done under such legislative authority. The only remedy of a party in such a case is a suit at law for damages. It is not the province of a court of equity to interfere by injunction in such cases and thereby thwart the legislative will. In this case the original dedication was as we have seen for a street. It appears that after the narrowing of the street to a width of ninety feet the property east of the street, which was there at the time of the dedication and that which has been added from time to time by natural accretion or artificial addition,

has been used and treated by the city of Chicago, as a public park known as the Lake Park, and has been recognized especially by the act of 1890 as a public park of the city of Chicago.

We deem the law to be well settled that the legislature has full control over the streets of a city and over all property of a municipality held by it in its governmental capacity, that is, property held like streets and public parks in trust for the public at large.

It may be that the legislature can not take away any easement of outlook or view, without providing for compensation for the easement so taken, or injured, to be made either by the state itself or by the city, but that it has the power to change or alter the public use for which such property may be held in trust, and especially where such changed public use is of the same nature or kind, there can be no question.

The question then recurs, whether or not the ordinance permitting the Art Institute through its arrangement with the Columbian Exposition, to erect the art building upon the site of the former Interstate Exposition building, can be justified, or is in conformity to the power conferred by the act of 1890 refered to.

The act of 1890 clearly contemplates the erection of buildings on the Lake Park by the Columbian Exposition Company, or under its authority, and provides for their removal within one year after the close of the exposition, unless otherwise arranged and agreed between the corporate authorities of said city of Chicago and the authorities who erected the same, and the act declares that ''if said city of Chicago shall agree to purchase said building, the authorities shall not ask or obtain from said city for said buildings a sum greater than the actual cost of building the same.''

Did the legislature by that act contemplate that buildings of a permanent character might be erected by the Columbian Exposition which the city of Chicago might desire to and should have the right to purchase at cost? It clearly appears that such was in the contemplation of the legislature.

If the city was to purchase a building or buildings at cost,. for what purpose or use was it to be done? Certainly not for removal.

The intention clearly was that, if the city did purchase any building so erected, that such buildings were to remain in the park for public uses and purposes in connection with said park. It was certainly contemplated that greenhouses, herbariums, buildings for the horticultural exhibitions and art buildings would be erected by the World's Fair Company.. Certainly an art building may be said to be a necessary concomitant to the carrying on of the World's Fair.

Is such a building in a public park a use of such park for public purposes or for park purposes? There can be no doubt of the power of the legislature to declare that this Lake Park should be for the education as well as for the physical enjoyment and recreation of the masses of the people. Are not such institutions as art galleries usually found in public places or public parks? Is it reasonable to urge that it is a perversion of the uses of a public park that there should be a building upon it devoted to art purposes, filled with paintings and works of art to delight the souls of the people who visit such parks? Are parks necessarily to be confined to the works of nature? Certainly this is a contracted view of the objects of public parks and should not prevail.

The power, it will be noticed, is given to the city to purchase the building so erected by or through the World's Columbian Exposition, and it is alleged that this was not a purchase by the city, but it will be observed that no time is fixed when such purchase shall be made, nor does the act require the consideration paid shall be in money. It is true that it is not, in probably the usual sense, a purchase, but the question is whether the arrangement made with the Art Institute by the city of Chicago comes within the spirit and scope of the act of 1890.

It is contended that the Art Institute is not a public organization, but is organized for private purposes. It is organized as a corporation, but not for pecuniary profit; it has

no stock. If this ordinance required the art building to be always open to the public, could it be said that it was not a public building, for the benefit of the public, although it might be under the management of the Art Institute corporation? Is the ordinance, or is it not, a reasonable exercise of the power of the city council, given by the act of 1890, to obtain for the benefit of the public a building erected by or under the authority of the Columbian Exposition? If the city can obtain for the use of the public such a building, for two full days each week and every Sunday afternoon and every legal holiday, free and clear of all charge to the public, filled with art treasures and without the expenditure of a dollar by the city, either for the erection of the building or for the paintings and works of art contained therein, and can have the same carried on, kept in repair, controlled and managed without the expenditure of any money on the part of the city, can it be said that such an arrangement does not come within the spirit and scope of the act of 1890? We think not. In our opinion, the art building to be erected, may be said to be public in its nature. The public, without cost to itself, obtains large benefits, free of charge, and the arrangement practically insures that such art building shall be managed, controlled and carried on in a manner probably better than the corporation itself could do, were it charged with so doing.

To hold that the action of the city and of the Columbian Exposition and Art Institute on the erection of the art building upon this Lake Park is authorized by the act of 1890 does not destroy or injure the park nor does it throw open the door to the city or other authorities or persons to erect other buildings or structures of any kind thereon. The only power of the city in connection with this art building is derived through the act of 1890, and can not be exercised, except in connection with the World's Columbian Exposition, or by its authority, so that there is no danger in this case of making a precedent by which the park may be lost to the public, or that private interests shall be enabled to obtain the erection of any buildings on said Lake Park.

Under the circumstances of this case, considering the *laches* of complainant, in enforcing any right she has to an injunction against the erection of this art building, that such delay has caused the Art Institute to expend a large sum of money, and that to now enforce this injunction against the Art Institute continuing the erection of said art building, such Art Institute will sustain a damage of nearly $100,000, and also taking into consideration the fact that the Columbian Exposition and said Art Institute are in possession and acting under proper legislative authority, with the duly authorized consent of the city of Chicago, and also considering that the evidence shows that the complainant will suffer no substantial damages if this art building is permitted to be erected as provided for in said ordinance, and being persuaded that the proposed erection of the said building, under the city ordinance, is within the spirit and scope of the act of 1890, and authorized thereby we must hold that the complainant should be left to her remedy at law for her damages, if any is sustained, and that the injunction herein should be so modified as to permit the Art Institute and the Columbian Exposition to proceed with and complete said art building under said act of 1890, and the said ordinance of the city of Chicago.

Judge TULEY: Judge Tuthill dissents to this opinion.

Judge TUTHILL: I wish to simply say this: I passed upon this question in my former opinion. Of course, it is unnecessary for me to repeat the view which I then expressed, inasmuch as I had not changed my view. I find myself unable to agree with the majority of the court in the view they take of this act of 1890–1, and for several reasons.

In the first place, I do not find in that act any power given to the city to purchase. I think if such power had been given that the law would to that extent have been unconstitutional, as being in violation of this provision of the constitution. No act thereafter passed could embrace more than one subject, and that should be expressed. The subject of this law was

the World's Columbian Exposition, not the giving of power to the city to do anything. It seems to me that mention of the city, "that if the city should purchase," must be construed to mean that if the city had power or should thereafter be given the power to purchase an Art Institute, and if the city could, in a legal manner, that is, with the consent of the property holders, become the owner of a building upon the lake front.

It does not seem to me that the law of 1890 gives the city any such power or attempts to give it; and if it did attempt to give it, it seems to me it would be in violation of the constitution.

I say that, having those views, I wish to state that, in justice to myself, I find myself unable to agree either with the reasonings or the conclusions of the court.

Judge TULEY: It is proper to say that we do not agree with Judge Tuthill. We think that this act gives full authority to the city, and that it is constitutionally expressed.

The following order was entered by the court:

Upon the motions of the city of Chicago, the World's Columbian Exposition, and the Art Institute of Chicago, for a dissolution or modification of the injunction heretofore issued in said cause, and after hearing affidavits and evidence and arguments of counsel, the court being fully advised in the premises,

It is hereby ordered that said injunction be made, and the same is hereby so modified as not to interfere with the erection, construction and use of a building on the Lake Front, between Jackson and Monroe streets, in pursuance of, and as contemplated by an ordinance passed by the city council of the city of Chicago, on the 30th day of March, 1892, and of an act of the general assembly of the state of Illinois, entitled "An act in relation to the World's Columbian Exposition, approved Aug. 5, 1890," and of all contracts made in pursuance thereof.