CITY OF KALAMAZOO *v.* MICHIGAN TRACTION CO.

STREET RAILWAYS — CONSTRUCTION OF ROAD — ORDINANCES — AMENDMENTS—CHARACTER OF RAILS USED.

* Defendant secured an ordinance from the relator authorizing it to construct and operate an electric street railway within its limits.   The ordinance provided, "The track * * * may be of the style known as 'T rail' or 'girder rail,' at the option of the grantee."   The city council reserved the right to make such other rules, orders, and requirements as might from time to time be deemed necessary to protect the interests, safety, welfare, and accommodation of the public, not inconsistent with the provisions of the ordinance, and to require the defendant to use such fixtures and appliances upon its said road, plant, and cars as might be deemed necessary to the public safety in the operation of said road.   The council subsequently amended the ordinance by requiring the defendant to put down a girder or grooved rail.   This was rendered necessary by the fact that the old T rail is unsuitable in streets paved with brick.   *Held,* that, under the terms of the ordinance, the city retained the power to require the use of the girder or grooved rail.

* Head-note by GRANT, J.

*Certiorari* to Kalamazoo; Adams, J. Submitted March 5, 1901. Decided May 7, 1901.

*Mandamus* by the city of Kalamazoo to compel the Michigan Traction Company to relay its track in accordance with the requirements of an amended ordinance. From an order granting the writ, respondent brings *certiorari*. Affirmed.

The following are the stipulated facts in this case:

1. That the city of Kalamazoo is a municipal corporation, duly organized and existing under and by virtue of certain acts of the legislature of the State of Michigan.

2. That, under and by virtue of the provisions of its charter and the laws of the State of Michigan, said city has the right and authority, by its council, to grant franchises for the operation of electric and other street railways within the corporate limits of said city, and to pass all ordinances governing the operation of street railways within the city.

3. That on the 27th day of March, 1893, the city council of said city, upon application of a duly-organized corporation known as the "General Electric Company," passed an ordinance entitled "Ordinance No. 101, Relative to Electric Street Railway," section 1 of which said ordinance is as follows, to wit:

"Section 1. *The City of Kalamazoo Ordains:* That permission and authority is hereby given and granted to the General Electric Company, its successors and assigns (successors to the Kalamazoo City and County Street Railway Company), to construct, own, and operate a single or double track electric street railway, with all necessary curves, turntables, switches, Y's, turnouts, and connecting tracks, in, through, over, upon, and along the streets, avenues, highways, and bridges in said city of Kalamazoo, as hereinafter named, or any portion thereof, subject, however, to all the conditions, specifications, and limitations hereinafter contained."

It is provided in section 5 of said ordinance as follows:

"The gauge of the track shall be four feet eight and one-half inches. All track hereafter laid, either for extensions or for the purpose of relaying present track, may be of the style known as 'T rail' or 'girder rail,' at the option of said grantee, its successors or assigns; but, whatever style of rail is used, the same shall not weigh less than forty pounds to the yard if 'T,' and not less than fifty-two pounds to the yard if girder, rail."

4. That subsequent to the passage of said ordinance, and prior to July 18, 1898, the Michigan Traction Company, a corporation organized and doing business under the laws of the State of Michigan, became the owner of all the rights and privileges belonging to the said General Electric Company under the aforesaid franchise known as "Ordinance No. 101," together with the properties owned and used by said General Electric Company in the operation of its street railway in the city of Kalamazoo; and that said Michigan Traction Company was then and there the owner of, and has ever since owned and operated, and still continues to own and operate, the several street-railway lines in the city of Kalamazoo under the authority granted by said ordinance; and that it became and was and is the duty of said Michigan Traction Company to observe, perform, and keep all obligations and requirements devolving upon the grantee named in said ordinance, and to obey the reasonable orders and requirements of the city council in regard to the operation of said street railway as required by the provisions of said ordinance and all lawful amendments made thereto.

5. That section 23 of said Ordinance No. 101, as originally passed, is as follows:

"SEC. 23. The said city council hereby reserves the right to make such further rules, orders, and requirements as may from time to time be deemed necessary to protect the interests, safety, welfare, and accommodation of the public in relation to said railway, not inconsistent with the provisions of this ordinance; but they shall not reduce the rate of fare herein provided for, or alter or repeal section one of this act."

6. That the rail in use upon the several routes of said street railway in Kalamazoo at the time the Michigan Traction Company became the owner of said property, and on the 18th day of July, 1898, was what is known as a "T" rail, weighing about 45 pounds to the yard; that, when said ordinance went into operation, the business streets of said city were paved with wooden blocks; that a rail of that weight is unsuitable for use in streets where brick or other substantial pavement is laid, on account of its light weight; that, since said ordinance was passed, the city has repaved several of its principal business streets with brick; that the running of cars over rails of that kind where brick pavement is used causes the brick used for paving purposes to become loose along either side of the rail for the distance of a foot or thereabouts, which causes the surface of the street to become rough and uneven, and to require more frequent repair, and that, in consequence of such rail being used, a street paved with brick becomes unsightly and inconvenient, requiring frequent attention and expense, and also renders it more inconvenient and dangerous for the passage of vehicles across and over the tracks.

7. That early in the summer of 1898 the city council decided to pave east Main street from the Grand Rapids & Indiana Railroad to Portage street; that notice of said intention to do so was given to the Michigan Traction Company, and said company was requested by the city council to take up the rail then in use on that part of its Main-street line so to be paved, and replace the same with a heavier rail; that said company declined to comply with the request of the council in that regard; that thereupon the city council, on the 26th day of July, 1898, amended section 5 of Ordinance No. 101 so as to read as follows:

"The gauge of the track shall be four feet eight and one-half inches. All track hereafter laid, either for extensions or for the purpose of relaying present track, may be of the style known as 'T rail' or 'girder rail,' at the

option of the grantor, and shall be of such weight and dimensions as the city council shall prescribe by resolution; and it shall be incumbent on said street-railway company, its successors and assigns, to replace the rail now in use on any part of its lines by rails of the kind above described whenever pavement is to be laid in any street where said railway is operated, and notice to that effect is served upon it by said city council."

8. That written notice of the introduction of said amendment, and that it had been presented to the city council, and giving the time when the same would be acted upon by it, was served upon the Michigan Traction Company five days before the passage of said amendment, but said company did not appear, and did not ask to be heard in relation thereto.

9. That an amicable adjustment between the Michigan Traction Company and the city council was had regarding the rail to be laid on east Main street in 1898 at the place hereinbefore referred to, and a like arrangement was had in regard to the rail laid at a point farther west on Main street where pavement is laid, the same being put down in the summer of 1899, with the express understanding, however, that the Michigan Traction Company should not, by entering into said amicable arrangement, in any manner waive its right to insist that said amendment to said Ordinance No. 101 was invalid, and that said common council had not authority to enact the same.

10. That in the spring of 1900 the city council, by resolution, determined to pave certain streets of the city with brick, among them Portage street from Main street to Lovell street; that notice to that effect, by direction of the city council, was served upon the Michigan Traction Company, accompanied with a request that said company should take up the rail now in use on that street ( the same being a T rail of the kind hereinbefore described ), and replace the same with an 8-inch grooved girder rail, similar to the one laid on Main street in 1899 (meaning the rail laid under said amicable agreement between said company and

126 MICH.—34.

the city council in 1899, namely, an 8-inch grooved girder rail).

11. That on the 19th day of March, 1900, the city council of said city amended section 5 of Ordinance No. 101 again, by adding after the words "girder rail" in said section, "or grooved rail," making the kind of rail permissible to be used on the street-railway lines of said city a T rail, girder, or grooved rail, at the option of the grantor; to be of such weight and dimensions as the city council should prescribe by resolution.

12. That notice of such proposed amendment was, by direction of the city council, served on the Michigan Traction Company five days before the passage of said amendment, but said company did not appear before the council when said amendment was acted upon, and did not in any way make known to the council, through any official communication, its position or wishes in regard thereto.

13. That the said amendments to Ordinance No. 101 were regularly and legally passed by the city council if it had the power and authority to make said amendments to said ordinance, and, if said amendments thereto are valid and legal, they are in force and effect.

14. That the expense to the Michigan Traction Company of complying with the requirements of said city council, and to lay said grooved girder rail in place of the T rail, which is not half worn out, would be about double that of relaying said T rail.

15. That the said Michigan Traction Company has neglected and refuses to comply with the order and requirements of the city council in said respect, and has notified it that it does not intend to and will not comply with said order, or make such change of rail, and denies the right of the council to amend its said franchise and said ordinance in said manner without its consent, and that it does not consider itself bound to recognize and respect the said amendments made to said franchise and ordinance, or that they are binding and in force.

16. That attached hereto is a true copy of Ordinance

No. 101, and of the amendments claimed to have been made thereto.

17. That, if the court finds that the city of Kalamazoo had lawful authority to enact and pass said amendments to said ordinance without the consent of the Michigan Traction Company, the city of Kalamazoo would be entitled to the writ of *mandamus* prayed in this proceeding, subject to the right of appeal from the decision of this court to the Supreme Court.

The original ordinance also required that, whenever the city council should order a street paved, the street railway should pave between the tracks in like manner as the street was paved.

*L. N. Burke* and *Dallas Boudeman*, for relator.

*James W. Osborn*, for respondent.

GRANT, J.   The sole question arises over the requirement to substitute a grooved rail for a T rail.   It is contended on behalf of the relator that the grooved rail is essential to the maintenance of a substantial pavement; that the requirement is therefore reasonable, is within the reservation of the ordinance itself, and incident to the powers and duties of the municipality pertaining to its streets.   It is contended on behalf of respondent that the substitution of the grooved rail is inconsistent with the original ordinance, and in violation of its contract with the city.   It admits the duty to repave whenever the city does, but maintains the right to use its own option, during the life of its franchise, as to the kind of rails to be used.

The question is an important one.   The stipulated facts are that the old T rail is unsuitable in streets paved with brick.   It renders the surface of the street rough and uneven; requires more frequent repair; causes more expense; is unsightly, inconvenient, and dangerous for the passage of vehicles.   Under respondent's contention, it could practically prevent any improvement in paving, or the adoption of new and better material, unless it could be

used in connection with the T rail, which the respondent had the right to lay when the road was constructed, and which it now claims the right to relay and maintain. It could not be compelled to substitute the grooved rail for the T rail even if the city should offer to pay the expense; for it claims that the right to lay the T rail was a part of the contract, which cannot be taken away. The amended ordinance does not impair the franchise conferred upon the respondent. The city recognizes respondent's right to the use of the street, to run its cars, and to charge the fares fixed by the ordinance. It only claims that conditions have changed, requiring essential changes in the character and manner of paving, and that the respondent must so construct and equip its road as to meet these changed conditions. In other words, the relator only claims that the respondent must lay new and different rails, at greater cost than that of the old ones. The respondent is deprived of none of its property, unless the increase in cost in consequence of the improvement amounts to such deprivation. It is essential that municipalities retain that control over the public streets and highways which is necessary for the protection and proper use of the public. Courts will jealously guard the right of such control. It must be a very plain provision, indeed, in a contract, which will justify the courts in holding that this power has been conveyed away. Where doubt exists, such contracts will be construed against the surrender of such power.

Counsel for respondent cites the following authorities: *People* v. *Railway Co.*, 118 Ill. 113 (7 N. E. 116); *State* v. *Railway Co.*, 85 Mo. 263 (55 Am. Rep. 361); *City of Binghamton* v. *Railway Co.*, 16 N. Y. Supp. 225; *Brooklyn Heights R. Co.* v. *City of Brooklyn*, 18 N. Y. Supp. 876; *City of Burlington* v. *Railway Co.*, 49 Iowa, 144 (31 Am. Rep. 145); *Hudson Tel. Co.* v. *Jersey City*, 49 N. J. Law, 303 (8 Atl. 123, 60 Am. Rep. 619); *Northwestern Tel. Exch. Co.* v. *City of Minneapolis*, 81 Minn. 140 (83 N. W. 527, 4 Mun. Corp. Cas. 360);

*Williams* v. *Railway Co.*, 130 Ind. 71 (29 N. E. 408, 30 Am. St. Rep. 201); *Mayor, etc., of Houston* v. *Railway Co.*, 83 Tex. 548 (19 S. W. 127, 29 Am. St. Rep. 679); *Easton, etc., R. Co.* v. *City of Easton*, 133 Pa. St. 505 (19 Atl. 486, 19 Am. St. Rep. 658); *City of Waterloo* v. *Railway Co.*, 71 Iowa, 193 (32 N. W. 329); *City of Detroit* v. *Plank-Road Co.*, 43 Mich. 140 (5 N. W. 275).

In *People* v. *Railway Co.* the question was: Can the municipality, under an authority permitting the construction of a street railway, compel the company to extend its tracks into streets where the road must be run at a loss? It was held that no such power was reserved. It is there said:

"Doubtless the common council, notwithstanding the grant to the railway company of the right to use the streets, retained full power and authority over the streets to improve them, and use them for all purposes for which they were dedicated to public use. But that reserved power conferred no right on the common council to compel, by ordinance, the construction and operation of a street railway."

In *State* v. *Railway Co.* the charter required the company to keep and maintain the space between its rails n good repair. The council sought to compel the company to put in a new pavement of stone. It was held that the original ordinance gave no such power; that the new ordinance was in violation of the contract; and that, under the pretense of exercising the police power, the duty of paving could not be shifted upon the defendant.

In *Brooklyn Heights R. Co.* v. *City of Brooklyn* the company, by its original charter, was granted authority to locate its car house and turnouts at such points as should be approved by the commissioner. Held, that such assent could not be withdrawn after its acceptance and the construction of the road and buildings.

In *City of Burlington* v. *Railway Co.* it was held that, where the charter gave the right to maintain a double track, it could not afterwards limit the company

to a single track. Such an ordinance was held a violation of the original contract. It was also there attempted to sustain the ordinance as an exercise of the police power. The court declined to pass upon that question, upon the ground that the double tracks were not shown to constitute a nuisance.

In *Hudson Tel. Co.* v. *Jersey City* it was held that the common council could not revoke the designation of streets for the erection of poles and the stretching of wires, after the ordinance had been accepted and the poles erected.

In *Northwestern Tel. Exch. Co.* v. *City of Minneapolis* it was held that the municipality could not arbitrarily order the poles and wires removed, and the wires placed underground. The case is a well-considered one, and recognizes the reservation of the authority in the common council to require the removal of the poles, if necessary for the protection of the inhabitants and the proper use of the streets. The opinion states:

" To prevent any misunderstanding, we add that the complaint tenders the issue that the city council arbitrarily, and without any reasonable necessity, enacted the ordinances complained of. The demurrer admits the allegations of the complaint in this respect, and our conclusion is based upon this admission. If, however, the plaintiff on the trial fails to establish such allegation by competent evidence, it must comply with the ordinance, for it is not to be doubted that the city council has the plenary power to extend the subsurface district wherever, in the exercise of a fair discretion, it decides that public interests require it to be done; but it cannot do so arbitrarily in the premises, as alleged in the complaint."

In *Williams* v. *Railway Co.* Mr. Williams was restrained by the court from moving a house along a public street, where it would obstruct the business of the company, and necessitate the cutting of its wires. The moving of a house is not an ordinary use of the street. In discussing the rights of the railway company the court said:

" It is undoubtedly true that all such rights are sub-

ordinate to the paramount power usually, denominated the
'police power,' for that power cannot be annihilated by
contract."

See, also, Booth, St. Ry. Law, §§ 39, 40.

In *Easton, etc., R. Co.* v. *City of Easton* the ordi-
nance was silent as to the style of rail to be used by the
company.   It originally adopted a flat rail, but concluded
afterwards to substitute a T rail, which created no greater
obstruction, and did not increase the cost to the city.
Held, that the use of such rail would not be restrained by
the courts.

A like state of affairs existed in *City of Waterloo* v.
*Railway Co.*   The court denied the city an injunction,
and said:

"The city may require defendant to so exercise the
privileges conferred upon it by the grant as that the use of
the street for ordinary purposes will not be unreasonably
interfered with.   It has the power to make all necessary
and reasonable regulations as to the manner in which the
track shall be constructed, and the condition in which it
shall be maintained."

In *City of Detroit* v. *Plank-Road Co.* the sole ques-
tion was whether a plank-road company could be deprived
of its property and its right to take toll by including one
of its toll houses and some of its road within the limits of
the municipality.

Counsel cites other authorities, but they are all of the
same import.   The cases cited may be thus classified:
(1) Those which absolutely take away some right expressly
conferred, and which does not conflict with the rights of
the public; (2) those which impose new burdens not con-
templated by the ordinances; (3) those which arbitrarily
impose conditions without any showing that they are nec-
essary for the protection and safety of the public.   They
do not, in our judgment, control the present case.

It is too late now to question the rule that these corpo-
rations may obtain contractual rights in streets and public
highways, which the municipality cannot repudiate or

annul, when such rights are not inconsistent with the ordinary uses of streets and highways. That rule is settled. The authorities do not, however, go so far as to hold that the grant of a right to use a certain kind of rail is irrevocable. On the contrary, the conclusion seems to be that, when the use of another kind of rail becomes necessary for the protection and safety of the public, the right to use the specified article must give way to the necessities and requirements of the public. Such contracts must be liberally construed in favor of the municipalities. Where the ordinance required that a street-railroad company should keep the parts of the streets used by it "in as good repair and condition as the city keeps the balance of its streets, and of even grade with the streets, so that carriages and other vehicles can cross with ordinary ease," it was held that, when the city repaved its streets, it was the duty also of the railroad company to repave. *State v. Railroad Co.*, 29 Fla. 590, 611 (10 South. 590, 595).

The power reserved by section 23 of the ordinance (see paragraph 5 of stipulated facts) was the power "to make such further rules," etc., "as may from time to time be deemed necessary to protect the interests, safety, welfare, and accommodation of the public;" but it expressly prohibited the reduction of the rate of fare, or the alteration or repeal of section 1. Section 9 also provides:

" The city council may from time to time require the said grantee, its successors and assigns, to use such fixtures and appliances upon its said road, plant, and cars as may be deemed necessary to the public safety in the operation of said road."

The learned counsel for respondent concedes that, under this reservation and the police power, the city might require respondent to use a heavier rail than a 40-pound T rail, or, at respondent's option, a girder rail, if necessary to preserve the pavement, and render it reasonably safe for travel. But the stipulated facts show that a brick pavement and the T rail cannot be used together without leaving the surface of the street not only rough, uneven,

and inconvenient, but dangerous. If respondent's contention be the law, the singular result would follow that respondent could not, with safety to the public, pave between the tracks with brick, as by the ordinance it is required to do, and that the city could adopt only such pavement as could be used with safety in connection with the T rail.

We must give the words "fixtures and appliances," as used in section 9, some force. The right to compel their use is clearly reserved. The term "fixtures" does not refer to movable things; it refers to things that are fixed. Trolley poles, overhead wires, rails, and ties are fixtures. This ordinance, fairly construed, cannot be held to mean that the respondent, in the construction of its roadbed in accordance with the provisions of the ordinance, obtained the right, during the existence of its franchise, to maintain its roadbed and rails in the same condition as when laid. The ordinance contemplated improvements which experience might show to be essential, in the growth of the city, for the convenience, welfare, and safety of travelers upon its streets, and the right to compel such improvements was reserved.

This court held, in an able opinion by Justice McGRATH, that the city of Detroit could compel a street railway to remove all that portion of its railway ties outside of the stringers on which the rails were placed, so that the street might be paved with a concrete foundation. The change involved great expense. The railroad bed had been constructed in accordance with the requirements of the ordinance less than two years before the change was ordered. The reservation in that case was the same as in this. The only essential difference between the two ordinances is that the one in that case did not expressly provide for laying the ties beyond the girders, while the one in this case expressly provides for the kind of rail. But the one in that case did provide that "the rails of said street railway shall be laid on a foundation equal to that of Woodward avenue, or any other first-class railroad." It com-

plied with the ordinance, and laid the track in the manner authorized by the city. The right to extend its ties beyond the girders was implied. It had been the ordinary way of constructing street railways. The foundation was equal to that of any other first-class railroad. *City of Detroit* v. *Railway Co.*, 90 Mich. 646 (51 N. W. 688). Would the rule have been different if the ordinance had expressly provided that the ties might extend beyond the girders,—then the customary method of constructing roads? Would the court have said that the pavement could not be laid unless the railway company would consent to make the change necessary for the pavement? We think not. We think this case is within the principle there established. The common council did not act arbitrarily, but reasonably.

Judgment affirmed.

MONTGOMERY, C. J., HOOKER and MOORE, JJ., concurred. LONG, J., did not sit.