(*Circuit Court of Cook County. In Chancery.*)

## Northwestern Elevated Railroad Company

### vs.

## City of Chicago, et al.

(Feb. 8, 1904.)

1. ELEVATED RAILROADS—RIGHT TO OCCUPY STREETS. The right to exist as an elevated railroad was derived by complainant from the state, but the right to occupy any of the streets of the city of Chicago by elevated railroad structures and the extent of such occupation is derived exclusively from the city by virtue of the ordinances granting the rights.

2. ELEVATED RAILROADS—JOINT USE—RIGHT TO EXTEND PLATFORMS. A provision in the ordinances that the tracks authorized to be laid should be subject to the joint use of other named elevated railroads gives to such elevated railroads no power as to the extension of platforms which is not conferred upon the railroad whose track they use.

3. STREETS—CONTROL OF BY CITIES. It has always been the policy of the state of Illinois that the municipalities should have the control of the streets within their limits. As regards the title of the streets, the fee is vested in the city, but it owns and controls the streets as trustee only.

4. ORDINANCES GRANTING RIGHTS IN STREETS—RULE OF CONSTRUCTION. The same rule of construction that would be applied to an act of the general assembly of the state granting the right of a railroad to occupy public highways should be applied to an ordinance of the city of Chicago granting rights and privileges in regard to the occupation of the street by a railroad company.

5. ORDINANCES GRANTING USE OF STREETS—FORCE AND EFFECT OF. An ordinance granting rights and privileges in regard to the occupation of the streets by a railroad company has all the force and effect of a statute law as to the right of the railroad company to use the street and as to the manner in which it shall occupy the same.

6. ORDINANCE—LEGISLATIVE INTENT—ASCERTAINMENT OF. The legislative intent is to be ascertained, in the first place, from the terms of the ordinance, and in the second place, by the application of such terms to the subject matter.

7. ORDINANCES—AMBIGUITY—PRACTICAL CONSTRUCTION BY EXECUTIVE OFFICERS. Where there is an ambiguity in a law or ordinance, practical construction given the same by executive officers charged with its execution should be considered, and when

the acts are repeated, and for a considerable length of time, they may have great and even controlling weight, and under certain circumstances, may be conclusive by way of equitable estoppel.

8. ORDINANCES—PRACTICAL CONSTRUCTION OF BY EXECUTIVE OFFICERS MUST BE OF SAME ORDINANCE. The practical construction of executive officers must rise from acts done under the law or ordinance to be construed, and not under other ordinances or laws.

9. ORDINANCES—WHEN CITY BOUND BY PRACTICAL CONSTRUCTION OF. There could be no practical construction and no acquiescence which would bind the city without knowledge, either actual or presumed, of the city council of such acts of practical construction of ordinances by executive officers of the city.

10. JUDICIAL CONSTRUCTION—ANALOGIES. Analogies are dangerous in judicial construction.

11. ELEVATED RAILROAD; EXTENT OF RIGHT OF WAY IN PUBLIC STREET. An elevated railroad's right of way in the street is confined to so much of the street as is actually occupied by it, and to extend its structure in a public street is an extension of its right of way.

12. PRIVILEGES AND FRANCHISES—CONSTRUCTION OF GRANTS OF. Grants of special rights and privileges in a public street should be strictly construed in favor of the public and against the grantee of the privilege.

13. STREETS—ENCROACHMENTS ON—RIGHT OF PUBLIC TO LIGHT AND AIR. The public have the right to insist that light and air shall penetrate every part of a street, not only to the surface but above the surface, and every encroachment upon such street, whether upon the surface or above the surface or below the surface, between such lot lines, is against the common right to the public, that the same shall be kept free and unobstructed.

14. ELEVATED RAILROADS—USE OF STREETS EXCLUSIVE. The use and occupation of the street by an elevated railroad is not in common with the public, but is exclusive. The part of the street above the surface which it occupies is in its exclusive use and that part of the street which is necessary to support the structure is also in its exclusive occupation and for the benefit of the elevated road.

15. ELEVATED RAILROADS—ORDINANCE GRANTING POWERS TO, CONSTRUED MORE STRICTLY THAN ORDINANCE GRANTING POWER TO SURFACE RAILROAD. The construction of an ordinance as to powers granted an elevated railroad must be construed not only more strictly than one granting powers to a surface street railroad, but it must be held that different principles apply in making such construction.

31

16. PUBLIC USE. By the "*public*" or "*public use*" is meant the people of the whole state.

17. STREETS—CITY HOLDS TITLE AS TRUSTEE. The city holds the fee and the control of the streets as a trustee for the public, and in its control of the streets its ownership is subordinate to its duties as a trustee. It is not a trustee for the inhabitants of the city, but a trustee holding and controlling the streets for the public use.

18. CITIES—POWER TO SELL FRANCHISES IN PUBLIC STREETS. The court is inclined to the opinion that the city is without power (even by the joint action of the mayor and aldermen) to sell or barter away any franchise in the publc streets for a compensation to be paid into the city treasury. The city as a public trustee of the streets is subject to the rule applying to all trustees, whether individuals or corporations, and that is that a trustee cannot control trust property for his or its own benefit. The city has power to exact a reasonable license fee for compensation for the extra cost it may be put to and the supervision and the use of its police made necessary by such use of its streets, but it cannot speculate or make money for its treasury, or its taxpayers, out of its exercise of the power to control the public streets as a trustee for the public.

19. CITIES—ESTOPPEL—ULTRA VIRES CONTRACTS. No estoppel can be placed upon the city for its action under an *ultra vires* contract.

20. Complainant, claiming to have succeeded to all the rights of the different elevated railroad companies whose lines jointly made up the so-called "Union Loop" in the city of Chicago, on the 27th day of May, 1903, obtained a permit from the commissioner of public works for the extension of the platforms of the elevated structure at the different stations on three sides of the Union Loop built upon certain streets, in accordance with a plan showing such platform extensions. After a considerable amount had been spent in extending the platforms and before the completion of the work the commissioner of public works revoked the permit and ordered the work to cease. The complainant thereupon filed a bill for an injunction praying that the order of the commissioner revoking the permit and ordering the work on the platforms to cease be declared void and of no effect and that the city of Chicago and the commissioner of public works be perpetually enjoined from interfering with complainant in the work of extending and altering the platforms of its stations. Complainant claimed that it had the right to extend the platforms of its various stations located on certain streets, under certain ordinances of the city of Chicago giving it the power to

construct and maintain over and upon certain streets "all necessary or proper stations, platforms and depot stations," etc., and also providing that "the permission and authority to locate, construct and maintain all such requisite platforms, being herein expressly granted said company whenever and wherever such methods of reaching said stations may be found necessary."
*Held:*

(1) That the power to *construct* platforms did not confer the power to *extend* platforms.

(2) That the ordinance as to powers conferred on elevated railroad companies must be most strongly construed against the donee and in favor of the public, and not extended by implication.

(3) That it was not the intention of the city council to grant to the elevated roads by the ordinances the right to make extension of their platforms.

(4) That the power to construct and maintain *requisite* platforms is clearly limited by the concluding words of that clause to such platforms as are requisite whenever and wherever such methods of reaching said stations may be found necessary.

(5) That a power to construct and maintain platforms limited to those which are necessary to reach stations, cannot be held to authorize the extension of platforms already constructed which extensions of platforms are not necessary to reach the station; *and that*

(6) The elevated railroads in question have no right under the respective ordinances granted them, to extend the platforms upon their respective lines without some further grant by the city council, and that the permit was issued by the commissioner of public works without authority of law and was properly revoked.

Bill for injunction and cross-bill. Circuit court of Cook county Gen. No. 244,799. Heard upon motion for a temporary injunction upon the bill and affidavits in support thereof, and the separate answers of the City of Chicago and commissioner of public works of the city of Chicago. Heard before Judge Murray F. Tuley.

The facts are stated in the opinion.

*Clarence A. Knight* and *John J. Herrick,* for complainant.

*Edgar B. Tolman,* corporation counsel, and *John W. Beckwith,* assistant corporation counsel, for defendants.

*Clarence N. Goodwin,* for certain property owners.

TULEY, J.:—

This bill is brought to determine the right under three certain ordinances of the city of Chicago, to extend platforms in connection with the elevated roads erected under said ordinances, and to restrain the city of Chicago from interfering with their so doing, under a permit granted by the commissioner of public works.

The ordinances, upon which the right to extend such platforms is claimed, are:

First. That of the Northwestern Elevated Railroad Company, the complainant in this case. January 8, 1894, an ordinance was passed by the city council, granting to said railroad company the right to erect an elevated railroad in the north division of the city upon property acquired, or to be acquired, and to cross all intersecting streets; the main line of the road commencing at Monroe street, in the south division of the city, or at a street or point north of Monroe street, between Wabash avenue on the east and Market street on the west, thence crossing the Chicago river and extending in a north or northwesterly direction to the city limits. On the 24th of June, 1895, an amendment to said ordinance was procured from the city council whereby said railroad company's route was somewhat changed in the north division of the city, and it was permitted at the intersection of Michigan street and Wells street to proceed southerly in and along Wells street and over and across the Chicago river and across the Wells street bridge and thence continuing southerly in and along Fifth avenue to the north line of Harrison street in said city. But it was made a condition that the elevated railroad constructed in said Fifth avenue should be subject to the joint use of the said Northwestern Elevated Railroad Company, the Lake Street Elevated Railroad Company, the Metropolitan West Side Elevated Railroad Company, the Chicago and South Side Rapid Transit Company and the Union Elevated Railroad Company under all contracts then existing, or which might thereafter be entered into between said companies, or any of them, and upon the further condition that said Northwestern Elevated Railroad Company should, as to that portion of

said elevated railroad in said Fifth avenue between Lake street and the southern terminus of the railroad in Fifth avenue, enter into a contract with the Union Elevated Railroad Company to lease it the said elevated structure to be built in said Fifth avenue, and that the said Union Elevated Railroad Company should construct and maintain the same.

The Lake Street Elevated Railroad Company had been organized with the view of constructing an elevated railroad upon said Lake street mainly in the west division of the city of Chicago, with an eastern terminus at Market street in the south division.

The Metropolitan West Side Elevated Railroad Company had been organized for the construction of an elevated railroad in the west division of the city of Chicago with a terminus in the south division at a point on Franklin street between Jackson and Van Buren.

The Chicago and South Side Rapid Transit Company had been organized for the construction of an elevated railroad in the south division of the city with the northern terminus at Congress street.

Before the passage of said amendment to the ordinance of the Northwestern Elevated Company, the city council had passed an ordinance by which the Lake Street Elevated Railroad Company was authorized to build its elevated structure from said Market street to Lake street and thence eastward upon Lake street to the east line of Wabash avenue in said city.

The Union Elevated Railroad Company (referred to in the amendment to complainant's ordinance), on the 14th of October, 1895, obtained authority of the city of Chicago by ordinance to construct and maintain an elevated railroad in Wabash avenue, from the north line of Lake street southerly, in and along Wabash avenue to the south line of Harrison street, with the right to make connection at Lake street with the Lake Street Elevated, and with the Chicago and South Side Rapid Transit Company's railroad at any point north of the south line of Harrison street between Wabash avenue and Fifth avenue. This ordinance contained substantially

similar provisions as to the use—of the tracks authorized to be laid—by the elevated railroad companies mentioned in the amendment to complainant's ordinance.

In June of the next year, being 1896, the last of the four ordinances running to elevated railroad companies (a part of each of which formed what is now known as the Union Loop) was passed. It was an ordinance running to the Union Consolidated Railroad Company, authorizing it to construct its elevated railroad in Van Buren street at its intersection with Wabash avenue, connecting with the tracks of the Union Elevated Railroad Company in Wabash avenue, then running westerly along Van Buren street across the bridge over the south branch of the Chicago river, to the tracks of the Metropolitan West Side Railroad Company in Van Buren street, at a point about two hundred feet east of Halsted street, and to make certain connections with said Metropolitan Railroad Company, and to connect the track authorized to be constructed in Van Buren street with the tracks of the Union Elevated Railroad Company in Fifth avenue (being the same which complainant was required by the amendment to its ordinance to lease to said Union Elevated Railroad Company), for the operation of the loop system.

This ordinance provided that the part of the elevated railroad structure authorized by the ordinance, between Wabash avenue and Fifth avenue, should be subject to the joint use of the Northwestern Elevated Railroad Company, the Lake Street Elevated Railroad Company, the Metropolitan West Side Elevated Railroad Company and the Chicago and South Side Rapid Transit Company, and the Union Elevated Railroad Company, upon such terms and conditions as had been agreed upon in all contracts now existing between such corporations mentioned or such contracts as might be entered into between the said companies or any of them, for the use and operation of the said railroad authorized by that ordinance. The ordinance does not define the route of the so-called union loop system. Said ordinance also provided that the permission and authority, rights and privileges in said ordinance conferred upon said last mentioned roads should be extended

to and conferred upon the respective successors and assigns of each and every of said railroad companies, —"and in furtherance of the object and purpose to have constructed the loop line contemplated by the several ordinances heretofore passed, granting to the said last named corporations, either severally or jointly, permission and authority to construct and operate elevated railroads in the city of Chicago, every and all acts or deeds of transfer of rights, privileges or franchises, and all contracts, mortgages, deeds of trust, leases, stipulations, licenses and undertakings made, entered into or given between the said corporations, or between any two or more of them, or between any one or more of them, and any other person or corporation respecting or concerning their several railways or the construction thereof, or the use and occupation of the same, are, and every such act, deed, contract, mortgage, lease, stipulation, license or undertaking is hereby approved, ratified and confirmed, and the same shall be deemed and held as valid and effectual to all intents and purposes as if made a part and the same are hereby made a part of the said several ordinances," but such act, deed, contract, mortgage, lease, stipulation, license or undertaking nowhere appears in the evidence or in the council proceedings offered in evidence.

The complainant in this case claiming to have succeeded to all of the rights of the respective railroad companies, part of whose lines constitutes the said union loop, on the 27th day of May, 1903, obtained a permit from the commissioner of public works for the extension of the platforms of the elevated structure built upon said Fifth avenue from Lake to Van Buren, and that built upon Van Buren from Fifth avenue to Wabash, and that built upon Wabash from Van Buren to Lake street, in accordance with the plan or plat showing such platform extensions.

The commissioner applied for and obtained from the law department of the city of Chicago an opinion that "If the proposed extensions on these three streets, or either of them, would unnecessarily impair the usefulness of the street." it would have no authority to grant the desired permit. There-

upon on the 27th day of May, 1903, a permit was issued to the complainant. The complainant immediately entered into contracts with several parties for the construction of such extensions of platforms and commenced work upon the same.

There was a change in the head of the law department of the city, and the question as to the right of the complainant to have such permit being brought before him, he promptly decided that the complainant had no right to such permit; thereupon the commissioner of public works, under the advice of the new corporation counsel, rescinded the permit which he had already granted. The work was stopped and this bill was filed.

The bill sets out the three ordinances hereinbefore referred to; the building of the elevated structure as authorized by said ordinances, respectively; which structures, together with that built upon said Lake street, from Fifth avenue to Wabash avenue, constituted what was called the "Union Loop," that the operation and control of so much of said elevated structure as constituted such union loop, had been transferred to the complainant, the Northwestern Elevated Railroad Company; alleges that by reason of the increase of travel upon said railroads and said loop, the necessity arose for the extension of said platforms in order to accommodate such increased travel; alleges the application for said permit as herein stated; its issuance and the subsequent revocation thereof as before stated; alleges the expenditure of a large amount of money in the construction of said extension platforms and the making of contracts for the same, amounting in the whole to some $70,000 or $75,000, and prays for a decree finding and determining that complainant had the right, under the ordinances as set forth in said bill and under the permit issued by the commissioner of public works, to alter and extend the platforms of its various railroad stations, located on Wabash avenue, Van Buren street and Fifth avenue, in accordance with plans theretofore submitted and approved by the commissioner of public works, as set forth in the bill; that the order issued by the commissioner of public works on the 2nd day of October, revoking the permit issued by him for

doing such work and ordering said work to cease, should be utterly void and of no effect, and that the defendants may be perpetually enjoined from interfering with complainant in the work of extending and altering the platforms of its stations and for a preliminary injunction. The commissioner of public works and the city of Chicago are made parties defendants.

The commissioner of public works answered the bill, admitting in substance, the passage of the ordinances to the several railroads as set forth in complainant's bill, putting the complainant upon proof as to many of the allegations, but as to the permit, admitting the issuance of the same upon the opinion of the then corporation counsel, and alleging that he understood that the opinion was that the complainant had a right to the permit if the work should be so constructed and maintained as not to unnecessarily impair the usefulness of the streets, avenues or alleys, or any portion thereof; which he, the said commissioner, understood referred only to the physical obstructions to the surface of said street and not the placing of any obstruction above the surface of such street, and that, under such misapprehension, he issued the permit. But that afterwards, upon an examination of the work as it was progressing under said permits, he, the commissioner, decided that the said lengthening of the platforms was unnecessarily impairing the usefulness of said streets, and that on about the 13th of October, 1903, he revoked all permits given for the extension of said platforms, setting forth the opinion given him by the new corporation counsel.

The city at first demurred to the bill of complaint, and then filed an answer, which answer challenges the validity of all three of the ordinances for which the permit issued for the extension of platforms upon their lines respectively; the principal ground being that the city council did not have jurisdiction or power to pass either of said ordinances, for the reason that it did not have before it the petition of the owners of a majority of the frontage of the street upon which said ordinances authorized the erection of an elevated railroad, said petition being a necessary prerequisite to the jurisdiction

of the council to confer the privileges and rights enumerated in said ordinances respectively. Also challenged the right of either of said railroads to erect stations in the public streets, to use them for commercial purposes, and also attacked the validity of said ordinances on the ground that the railroads authorized by them had not been built between the termini mentioned in them respectively, and upon other grounds unnecessary to mention at this time.

By agreement in open court, when the motion in this case for temporary injunction came on to be heard, a date was fixed for the hearing of it, and also a date for the filing of pleadings and affidavits in support of the motion.

In support of the complainant's bill, several affidavits were filed, showing that the travel upon this so-called loop had been increased from the commencement of its operation in 1897 or 1898 from 150,000 passengers daily to over 300,000; that at certain hours in the morning and afternoon, called "rush hours," there was much congestion at the depots and upon the platforms from which passengers arrived and departed, whereby parties traveling upon such elevated railroads were subject to very considerable inconvenience and delay. Also there was presented a report of a celebrated railway expert, one Arnold, made to the city council upon his employment by the council, but which report was never acted upon by said council except to spread the same upon the record, in which report it was stated, in substance, that the capacity of the present double track loop is limited to the maximum number of trains which it is possible to pass in all directions through the junction points, and that the capacity of the junctions cannot be increased; that under existing conditions, however, it is the station platforms of the loop and not the junctions which limit the number of trains that can be operated over its tracks; that these platforms are much too short to admit trains being operated at intervals and speeds which will exceed the capacity of the junctions, and should be lengthened sufficiently to permit two trains of five cars each to simultaneously occupy the platform. That at the present time during the hours of maximum traffic the average time consumed by a train in making

a complete circuit of the loop is twenty minutes, but if two trains of five or six cars each could simultaneously occupy a platform, the time would be reduced to fifteen minutes. That there are eleven stations on the loop at which all trains stop, and under the present conditions each train must be retarded and accelerated twenty-two times instead of eleven times, as would be the case if the train could approach the station platform without having to wait for the preceding train to move out of its way. That the extension of these platforms sufficiently to provide for the accommodation of two full trains at the same instant is the only method by which the present capacity of the two-track loop structure can be increased. The report of Arnold was supported by affidavits of officials connected with the operation of the elevated roads using the union loop.

It should be stated that the report of Arnold also states that: "Should the time ever come when all the elevated railroads are consolidated under one control and passengers are transported within the district served by all of the companies for one fare, the problem of increasing the loop capacity would cease to be a problem, as the tracks now forming the loop, by slightly changing the present junction points, would become a simple section in the through lines that would be operated between the north, south and west divisions."

The motion for a temporary injunction was ably argued at great length by the respective counsel, and many authorities were cited.

In considering the question as to the right of the complainant to have the permit issued by the commissioner of public works for the extension of the platforms in question, it must be borne in mind that the operation of elevated railroads upon the said loop is by authority of the four ordinances:

1. The Lake Street Elevated, authorizing it to extend its elevated structure from Market to Wabash avenue, making one side of the loop, and amendment thereto.

2. The ordinance of the Northwestern Elevated Company, authorizing the erection of a structure on Fifth avenue, making another side of the loop.

3. That to the Union Elevated Company, which makes the Wabash avenue side of the loop; and

4. That to the Union Consolidated Elevated Company, which makes the Van Buren street side of the loop.

There is no loop ordinance for a continuous railroad around this loop, but the authority is derived from the ordinances authorizing the erection of said railroads upon the four sides, as before mentioned.

If the complainant has any right to a permit for the erection of the platforms in question, it must be found in each of the said four ordinances as to the platforms to be erected upon the line authorized by said ordinances respectively.

I did not overlook the rather vague reference, in the Union Consolidated Elevated ordinance for Van Buren street, to the loop system and its operation. That would confer no power as to the other elevated structures authorized, which constitute with it the remaining portions of the loop; admitting that the complainant has succeeded to all the rights of the grantees in the ordinances, parts of the lines authorized by which, constitute such loop, it does not acquire any additional rights by so doing. As purchaser or assignee or by contract obtaining the control of all elevated structures constituting said loop, the complainant's right to have an extension of platforms must be found in the said four ordinances, respectively, a part of the lines of which as before stated, constitute said union loop.

It is not contended that the act of the commissioner of public works in issuing the original permit, gave the complainant any right to have such extension of said platforms if the complainant had not the right under the ordinances referred to.

The right to exist as an elevated railroad company was derived by the complainant and the other grantees in said ordinances from the state, but the right to occupy any of said streets by elevated railroad structures and the extent of its occupation, the grantee in such ordinances derives exclusively from the city by virtue of the ordinance to such grantee, respectively.

The provision in the respective ordinances in question that the tracks authorized to be laid by the ordinances should be

subject to the joint use of other named elevated railroads,. gives to such elevated railroads no power as to the extension of platforms which is not conferred upon the railroad whose track they use.

It has always been the policy of the state of Illinois that the municipalities should have the control of the streets within their limits. *Snell v. Chicago*, 133 Ill. 413.

This control over the streets by municipalities is guaranteed by the state constitution, section 4, article II, which prohibits the general assembly from passing any law granting the right to construct and operate a street railroad within any city, without the consent of the local authorities having the control of the streets, or highways, proposed to be occupied by such street railroad, and limits the power of control of the streets (See Hurd's Statutes, page 429), by requiring a petition to the city council of the owners of the land representing more than one-half of the street frontage as a condition precedent to the granting the use of the street, for an elevated railroad in the street, or of so much thereof as is sought to be used for railroad purposes, thereby also recognizing that abutting property owners have a special interest in the use of the street over and above that of the public at large.

This control of the city over the streets must be within the limits of its charter power. The title of the streets, the fee, is vested in the city, but the city does not own the streets as an individual owns his lot, or a piece of real estate, but the city owns and holds and controls the streets as trustee only. "The fee is vested in the city for the use of the public, and their free and untrammeled use belongs to the public. *Snell v. Chicago, ante*. And the fact that the city owns and controls the streets only as trustee with limited powers as such trustee, should be kept steadily in mind in the consideration of the questions involved upon this motion. The ordinances referred to, therefore, are the only authority which these elevated railroad companies have to use the streets of the city for their corporate purposes.

The complainant's rights to the extension of these platforms depends upon the authority conferred by said respec-

tive ordinances, and the construction to be placed upon such ordinances. The authority in regard to the construction of platforms is substantially the same in each one of the three ordinances in question, the Northwestern Elevated, the Union Elevated and the Union Consolidated Elevated Railway Company.

It is only necessary to refer to a part of sections 5 and 7 of the original ordinances to the Northwestern Elevated Railroad Company, which sections become applicable to the elevated railroad and structure erected in Fifth avenue under the amendment to said ordinances, passed June 24, 1895, Section 5, after providing that the tracks shall be used for passenger trains only and for accommodating and handling passenger traffic and the mails exclusively, provides: "To which end the said company shall cause its trains to be regularly and systematically moved at such intervals as shall be necessary to accommodate the public, and the number of all such trains, and the frequency with which they are moved, shall be increased as rapidly as the demands of the public shall render necessary and the increase of traffic warrant."

A similar provision is found in each of the ordinances. The duty enjoined here would probably necessarily be implied without any special provision to that effect—implied subject to the limitation that such duty should be performed so far as the rights or franchises conferred by the ordinance would admit.

Section 7 of said ordinance is as follows: "Sec. 7. The said company shall have permission and authority, and the same are hereby given and granted to it, to construct and maintain over the streets, avenues and alleys, or portions thereof, across which its said elevated railroad is to be permitted to be constructed, as aforesaid, all necessary or proper stations, platforms and depot stations, and to connect the same with said streets, avenues and alleys by means of all necessary stairs, stairways, elevators, landing places, and other constructions and appliances for ingress, egress and the accommodation of passengers; but such platforms, stations, stairs, stairways, elevators, landing places, etc., shall be so constructed

and maintained as not to unnecessarily impair the usefulness of such streets avenues or alleys, or any portion thereof. Neat and commodious passenger stations of easy and convenient access shall be provided, and all such station buildings and appurtenances, and likewise all passenger cars—when the latter are in use—shall be comfortably heated during the winter months, or whenever necessary at any season, and they shall be properly lighted with gas, electricity or otherwise, and thoroughly ventilated at all seasons. The platforms of all of said passenger stations shall be free from obstructions or projections of any kind; and all of said platforms and lines of stairs leading to and from the same shall be securely protected by strong wrought iron or steel railings, not less than three and one-half feet high. The permission and authority to locate, construct and maintain all such requisite platforms, landings and lines of stairs leading to and from the sidewalks of the streets, avenues and alleys, and the said elevated stations, being herein expressly granted said company, whenever and wherever such methods of reaching said stations may be found necessary.''

I shall assume that this section confers upon the railroad as full authority and rights as to the elevated structure constructed under the amendment to its original ordinance as is given to the Union Elevated and Union Consolidated Elevated under their respective ordinance.

The case of *Tudor v. The South Side Rapid Transit Company*, 154 Ill. 129, holds, that ordinances of this nature (that is, granting the right to use the streets of a city), passed by the city council of the city of Chicago under and by virtue of its charter power, have all the force and effect of an act passed by the general assembly of the state. The same rule of construction that would be applied to an act of the general assembly of the state, granting the right to a railroad company to occupy the streets of the city of Chicago (assuming that the state was not prohibited by the constitution from so doing), should be applied to the ordinance of the city of Chicago granting the rights and privileges in regard to the occupation of the street by a railroad company. In other words,

the ordinance has all the force and effect of a statute law as to the right of the railroad company to use the street and as to the manner in which it shall occupy the same.

The object in construing any statute or ordinance is to ascertain the legislative intent. If the language of the ordinance appertaining to platforms, in clear and explicit language confers the right upon complainant to have an extension of these platforms, there is no room for construction, and all the court has to do is to give effect to such express language. But, if the language is not clear and explicit, then it is a question of reasonable intendment in view of all the circumstances of the case. Lewis, Eminent Domain, secs. 254, 255.

This legislative intent is to be ascertained, in the first place, from the terms of the ordinance, and in the second place, by the application of such terms to the subject-matter.

The section quoted gives authority to construct and maintain over and upon (in this case in Fifth avenue, from Lake street to Harrison): "all necessary or proper stations, platforms and depot stations, and to connect the same with said streets, avenues and alleys by means of all necessary stairs, stairways, elevators, landing places," etc., and the latter part of the section, so far as quoted, provides: "The permission and authority to locate, construct and maintain all such requisite platforms, landings and lines of stairs leading to and from the sidewalks of the streets, avenues and alleys, and the said elevated stations, being herein expressly granted said company, whenever and wherever such methods of reaching said stations may be found necessary."

The power given the company to construct and maintain requisite platforms, is clearly limited by the concluding words of that clause to such platforms as are requisite whenever and wherever such methods of reaching said stations may be found necessary—limited by confining the power to erect and maintain platforms necessary to reach the stations.

It will be kept in mind that the ordinances recognize the right of the railroad company to locate its stations upon its own property, purchased or condemned, for its railroad uses,

but a power to construct and maintain platforms limited to those which are necessary to reach the stations, cannot, by any reasonable construction, be held to authorize the extension of platforms already constructed, which extensions of platforms are not necessary to reach the stations. So far as appears, platforms necessary to reach the stations were constructed when the road was built.

I am of the opinion that the limitation as to being necessary to reach the stations, destroys the force of the contention that it authorizes an extension of platforms already built.

But, the forepart of the section 7 quoted, gives authority to construct and maintain all necessary or proper stations, platforms and depot stations, and the broad question is, whether that clause, taken in connection with the subject-matter, confers upon the railroad the right to extend its platforms or to have a permit for the extension of its platforms whenever, by reason of the increased traffic, such extensions are found necessary or convenient for the accommodation of such travel.

It must be admitted that upon the face of the section in question, there is no express reference to or power given to extend platforms, or for the extension thereof.

If such power to construct and maintain necessary platforms had the words, "and extensions thereof," following the word "platforms," or, if it had read, "to construct and maintain from time to time such platforms as might be necessary," or, if it had read, "to construct and maintain such platforms as may from time to time become necessary, or be necessary," the ordinance would have conferred the power in clear and explicit terms, and the omission of any reference to the extension of platforms or to constructing and maintaining platforms in the future, must, to say the least, raise some doubt as to whether it was the intention of the city to confer upon the railroad by the use of the words "to construct and maintain all necessary platforms," "the power to extend such platforms when such extension became necessary."

Learned counsel for complainant contends that the power to construct platforms confers the power to extend platforms,

32

upon the ground that the greater includes the less.     This appears to the court to be begging the question.

The ordinance requires a section of the proposed elevated structure to be presented to and approved by the commissioner of public works, and especially provides that the plans and specifications of such depots, platforms and stairs, shall be submitted to and reported by the commissioner of public works before the work of construction thereof shall be commenced.     If A should give to B a right to construct and maintain upon his land a house with necessary platforms or verandas, the plans and specifications of such platforms and verandas to be submitted to and approved by C before the construction thereof shall be commenced, it is clear that such authority to construct and maintain such house with such platforms and verandas as C might approve, would not authorize B to make any additions to such house, or to the platforms or verandas.

The requirement that the plans and specifications of the depots, platforms and stairs shall be submitted to and approved by the board of public works before the erection thereof shall commence, qualified the words "necessary depots, platforms and stairs," and identified and limited them to those so submitted and approved.

Clearly, upon the authority of *Sexton v. City of Chicago*, 107 Ill. 323, if a contract had been made for the erection of the elevated railroad structure and necessary depots, platforms and stairs as required by the ordinance, the requirement that the plans and specifications for such depots, platforms and stairs were to be submitted to and approved by the board of public works, would have to be limited and controlled as to the amount of work to be done under such contract; or, if an ordinance should be passed authorizing a company to construct and maintain in a public street a market house with necessary platforms and porches according to plans and specifications to be submitted to and approved by the commissioner of public works, and rent stalls in the same, it would scarcely be contended that it conferred a right to ex-

tend the market house or its platforms and porches from time to time as the increasing growth of the city might demand.

It will be noticed that the power to construct and maintain necessary platforms is used in connection with and with reference to depots (or stations). Depots, platforms and stairs are made a class unto themselves, and are the only part of the elevated structure, plans of which are required to be approved by the commissioner of public works.

It must be admitted that where there is an ambiguity in a law or ordinance, practical construction given the same by executive officers charged with its execution should be considered, and when the acts are repeated, and for a considerable length of time, they may have great and even controlling weight, and under certain circumstances, may be conclusive by way of equitable estoppel. But this is no such case.

It is claimed that the commissioner of public works has issued permits under various ordinances concerning elevated railway companies in this city.

The first permit referred to is one issued in February, 1899, to the Lake Street Elevated to lower the elevated structure between Forty-sixth and Fifty-second streets, and to build a station according to a plat, and under which two new platforms, one hundred and fifty-three feet in length, extending over a part of Lake street, were built. The city contends, not without some grounds therefor, that this was done under a power to make a connection at the point indicated, and that the evidence does not show that there was no other authority than that contained in the ordinance. It is sufficient, in my opinion, to say that the power to issue permits to build or extend platforms under the Lake Street Elevated ordinance is not now before the court. It is only as to platforms under the three ordinances, the Northwestern Elevated, the Union Elevated, and the Union Consolidated Elevated, that are in question.

The second permit was to the Northwestern Elevated, April 21, 1899, and was to construct an extension to the platform on the west side of Fifth avenue south of the intersec-

tion of Lake street, such extension being some forty-eight feet long and eight feet wide.

The third was a permit to the Lake Street Elevated, by the building commissioner, to erect a frame station and waiting room at Fifty-second and Lake street. The power to do this, under the Lake Street Elevated ordinance, is not before the court, nor is it shown that it issued under no other authority than the ordinance.

The fourth was a permit to the Metropolitan West Side Elevated, December, 1902, to build an extension of a platform on the Franklin street station. The same objection as to the last applies.

The fifth was for a permit for the extension of the platform at Wilson avenue and Evanston avenue over private property of the Northwestern Elevated Company. It would be carrying the doctrine of practical construction entirely too far to hold that the action of the executive officers of the city, in regard to permits issued under ordinances other than those in question in this case, could have any weight with the court in determining the question whether these ordinances as to the elevated structure at Fifth avenue, Wabash and Van Buren street, conferred on the grantee in those respective ordinances the power to extend platforms.

The practical construction of executive officers must rise from acts done under the law or ordinance to be construed, but not under other ordinances or laws. Even if such other ordinances or laws were similar in substance, the proof does not show that there was any express authority other than that contained in such other laws or ordinances.

The acts relied upon were so few and the time in which they were performed so short as to entitle them to but little, if any, consideration of the court in the construction of the ordinances in question.

The same may be said as to the effect of the alleged acquiescence. In fact, there is no evidence to show that the city council ever knew of such acts of practical construction, and there could be no practical construction and no acqui-

escence which would bind the city without such knowledge, either actual or presumed.

The claim that the city is estopped by acquiescence in the alleged acts of construction, has no foundation in the evidence or in the law applicable to the facts in this case.

Where the law or the ordinance does not confer the power claimed, in clear and explicit words, as I have held is the case as to the three ordinances in question, what rule of construction should apply?

The counsel for complainant admits that where there is a grant in derogation of private rights, it must be strictly construed, but contends that the cases distinguish between a grant of power as to the location of the termini of a railroad and the grant of power in connection with the operation of the road.

That, in the first place, the doctrine of strict construction —that nothing is to be taken by intendment—applies, and the power when once exercised is exhausted while in the second case the construction should be liberal to effect the object and purposes of the grant, and, consequently, the power—as, for example to construct necessary sidetracks—is not exhausted by one exercise of the power but is a continuing power.

A leading case in this state, often cited in other reports, is found in the 17th Ill., page 123, the case of the *C., B. & Q. Railroad Company v. Wilson*. By its charter the railroad company was authorized to maintain and continue a railroad with single and double track on a prescribed route, "with such appendages as may be necessary for the convenient use of the same, and to acquire the right of way or title to land necessary."

In two or three years after the location of the railroad, it filed a petition to condemn land for constructing and maintaining thereon turn-outs, depots, engine houses, shops and turn-tables. The court held that the grant to a railroad company to construct a road with such appendages as may be necessary for the convenient use of the same, will authorize

it to acquire land by condemnation for shops, etc., these being necessary appendages; that "This power is not exhausted by an apparent completion of the road if an increased business demands other appendages or more room for tracks."

The court held in this opinion that: "There can be no doubt that the legislature intended to embrace all such conveniences as would be necessary for the successful conduct of the business of the road, as depots, repairing shops, and the like, under this general designation without particularly specifying either. The history of this class of our legislation shows that such was the intention and understanding of the legislature. In some railroad charters more, and in some less, of these conveniences are specially authorized, while in others none are particularized, while in all cases, lest some should be omitted, some general expression is used with the manifest design to cover all that may be found useful and convenient."

And upon the point as to whether a road having been actually completed and running, the power to condemn land, either for tracks or other appendages, is exhausted, the court says:

"It would be a disastrous rule, indeed, to hold that a railroad company must, in the first instance, acquire all the grounds it will ever need for its own convenience or the public accommodation. * * * We cannot suppose that it was the intention of the legislature to oblige the company to acquire all the land in the first instance, which, in any event, it should ever want, to do the largest amount of business it may ever hope to attain," and "we are of the opinion that the company still has the right to acquire such lands as it may need for the accommodation of its business, from time to time, by the coercive process pointed out by the law." This case has been followed by: *Fisher v. C. S. R. R. Co.,* 104 Ill. 323; *McCartney v. C. & E. R. R.,* 112 Ill. 611; *Kotz v. I. C. R. R.* 188 Ill. 578, and by the following cases bearing on the rule of construction to be given analogous provisions: *C. & W. I. R. R. Co. v. Ills. C. R. R.,* 113 Ill. 156; *W. Chi. Park Com'rs v. McMullen,* 134 Ill. 170.

Another leading case is found in the 16th Ohio State Re-

ports (*T. & W. R. R. Co. v. Daniels*, 16 Ohio St. 390), wherein it was held that "A railroad company has power to condemn land for new sidetracks, leading from the main road to its depot buildings, whenever they become necessary in the proper management of the road."

In that case it was contended that the power to condemn land for sidetracks having once been exercised, it became exhausted, and therefore there was no power to condemn land for new sidetracks without further legislative action being had, but the court say: "It is true that grants of this nature, being in derogation of private right, must be strictly construed. If, therefore, there is reasonable ground of doubt as to whether the legislature intended to grant the continuing power claimed to be exercised here, the doubt should be resolved against the company, and it must go back to the lawmaking power for a new grant." That court holds that: "The power to make 'necessary sidetracks' *prima facie* is the power to make them when they are necessary. Otherwise it would be the power to make unnecessary sidetracks. *Prima facie* power to do any act is power to do it in such manner and at such time as is usual, convenient and reasonable, in such way as prudent men manage their own concerns;" and quote with approval the case of the *C., B. & Q. Railroad Company v. Wilson*, 17 Ill. 123, above referred to, that: "It would, indeed, be a disastrous rule to hold that a railroad company must in the first instance, acquire all the ground it will ever need for its own convenience or the public accommodation," etc.

The two leading cases referred to, the 17 Ill. and the 16 Ohio State, have been cited with approval by Judge Brewer in *C., B., U. P. R. R. Co. v. A., T. & St. F. Ry. Co.*, 26 Kan. 669

The cases cited are only a few of the numerous cases to the same effect cited by complainant upon this argument. They are nearly all of them cases arising out of the exercise of the power of eminent domain. If the case at bar is to be governed by the decisions of the courts in this and other states as to the exercise of the power of eminent domain by surface

roads for the condemnation of land for the erection of side-tracks or switches, which, after the construction of the road, became necessary to its operation, the cases referred to would seem to be controlling. But this is not a surface railroad, nor is it a question of necessary sidetracks or switches to be placed on a right of way purchased or condemned for the operation of a surface railroad. Analogies are dangerous in judicial construction.

When we come to consider the subject-matter concerning which we are construing these ordinances, it will be seen that the subject-matter is different in many essential particulars from what may be said to be the subject-matter in the cases cited.

A railroad is authorized to acquire for the purposes of its road by the statute one hundred feet in width on the proposed line of road. This one hundred feet in width is called its right of way, which is devoted primarily to railroad purposes.

It is true that the constitution provides that railroads shall be public highways, but they are not public highways in the sense that a street is a public highway.

The question of the construction to be given to a law or ordinance, authorizing a surface railroad to construct necessary appendages, namely, engine houses, sidetracks or switches, upon its own right of way or to condemn private property therefor is a very different question from the one at bar.

It will scarcely be contended that the entire street constitutes the right of way of these elevated railroads like the right of way condemned or purchased for a surface railroad. The question here is not whether these elevated railroads shall have a right to condemn property for accessories rendered necessary by increased travel or whether they shall have the right to put such accessories upon their own right of way. They have no right of way in the public streets beyond that now occupied, and the question is: Shall they be allowed to take more of the public street than that originally granted them and now occupied by them?

We have a statute in this state making it the duty of all railroad corporations to keep their rights of way clear from all dead grass, dry weeds or other dangerous and combustible material, and for neglect so to do they will be made liable to certain penalties. In the case of *L. E. & W. R. R. Co. v. Middlecoff et al.*, 150 Ill. 27 (which was a suit against a railroad company for damages caused by fire from a locomotive setting fire to grass in the street which communicated to the plaintiff's premises), the railroad company had a city ordinance which granted it the right to lay its track in the street, and the question as to what constituted the railroad right of way in a street arose, and it was held that the right of way of a railroad company in the street of a city includes only that part of the street held and in actual use by such railway company, its main track, sidetracks, switches and turn-outs that are in any way connected with the main track and used by the railroad company for loading and unloading cars, or for storing cars. This case holds that the right of way of a railroad in a public street includes only so much of said public street as is actually occupied by such railroad company. Therefore, an elevated railway company's right of way in the street is confined to so much of the street as is actually occupied by it and to extend its structure in a public street is an extension of its right of way.

A number of cases have been cited as to the construction of grants to railroads to use streets of a city, among them the case of *McCartney v. C. & E. R. R. Co.*, 112 Ill. 611, where a grant was made to a railroad to build either a horse railroad or a steam railroad in a public street, and to use either horse or locomotive power. The company having first used horse power, some years afterwards desired to use steam power, and the supreme court of this state decided that, having used horse power, the right to use steam power still existed and was not exhausted by their having first used horse power.

Also, decisions from Missouri and Indiana and other states, that an ordinance to a railroad company to lay a single or double track, or single and double tracks, was not exhausted

by the laying of a single track when the same, by reason of increased travel, became necessary. *Ransom v. Citizens' Ry.,* 104 Mo. 375, 16 S. W. 416.

Also a case is cited from 85 N. W. Rep., in which the question was as to the power of the city to require the laying of a grooved rail in place of one mentioned in the ordinance. *City of Kalamazoo v. Michigan Traction Co.,* 126 Mich. 525, 85 N. W. 1067.

The main case cited upon this point is found in the *Detroit Citizens' St. Ry. Co. v. Bd. of Public Works,* 126 Mich. 554. In that case the Citizens' Railway Company was, by an ordinance of the city of Detroit, given a right to construct and maintain a single track in a certain street, and to construct and use necessary and convenient tracks for turn-outs, side-tracks, curves and switches, wherever the same might be necessary. Some years after it began operation, it claimed the right to lay down in the street a new switch track, and instituted a proceeding by mandamus against the commissioner of public works of Detroit to compel him to issue a license so to do. Mandamus was ordered by the lower court and appealed to the supreme court. The supreme court, in its opinion, cited certain provisions of the Detroit city charter, and held that these gave legislative power to the city council and the administrative power to the board of public works, and affirmed the opinion of the court below. The division of powers which existed under the charter of the city of Detroit once existed under the charter of the city of Chicago, but does not exist under the present charter. Under the present charter the powers of the board of public works are derived from the ordinances of the city, and it has no independent administrative power granted it by the legislature. In that respect the case differed from the one at bar.

The supreme court, while it held that the court below properly held that "the relator's right at the time of the construction of its road to lay switches, etc., was limited by public convenience, and it would not then have been permitted to lay more than the then traffic demanded; and that when

public travel demanded more, the relator could be compelled to lay them," but they also said "that the sole contention is that the power to act lies in the common council and not in the board of public works," holding, as stated, that under the peculiar provisions of the charter, the administrative power to act was in the board of public works. That case also differs from the present in this: there was power given to lay sidetracks and switches wherever the same might be necessary, which, it may be reasonably contended, indicated a provision as to future necessities.

But there is a vital difference between a surface railroad and an elevated railroad. The difference is so vital as that in the opinion of the court the decisions referred to should not control in the case at bar. When a surface railroad exercises the power of eminent domain against private property for an additional switch rendered necessary by the increase of business, it is compelled to make compensation to the owner of the land. When it lays down additional switches, sidetracks, and turn-outs, on the surface of the street, while it may or may not to some extent obstruct the general public in the further use of the street, it does not prevent the general public from using that street. The use of a street by a railroad is recognized by our supreme court to be a legitimate method of travel in the street, and that it is to be used in common with the general public, and any ordinance or provision by which it is to have exclusive use of the street is beyond the power of the city to grant, because of the trust character in which the city holds title of the street and the power to control it. See the Ligare case, 139 Ill. 46.

It must be admitted that the evidence shows that the travel upon this loop has increased from 150,000 to 300,000 daily, and that travel upon the loop is badly congested at certain hours of the day. It must also be admitted that extending the platforms to double their present capacity, would enable two trains of five or six cars each to load and unload at the platforms at one and the same time, while, as at present constructed, the platforms will admit of the loading and unloading of but one train of five cars. It must also be admitted

that Arnold's report, and the affidavits in evidence, shows that
by such extension the congestion of travel upon the road can
be materially relieved, and the time of the running of the loop
be shortened from twenty minutes to fifteen, if the platforms
were extended all around the loop, as two trains running to-
gether would make but one stop at eleven stations each of
the loop, instead of making twenty-two stops in place of eleven
at the platforms as now constructed. Arnold's statement and
calculation was made, considering the loop as a finished whole,
but there was no permit issued or applied for to extend the
platforms of the Lake Street Elevated side of the loop, as the
Lake street ordinance expressly limits the length of the plat-
forms and stations to one hundred and eighty feet. It is only
as to three sides of the square forming the loop that the per-
mit of the commissioner of public works was issued which is
now in controversy. It is clear that as to the Lake street side
of the loop the complainant must go to the city council, and
that the running time of the loop saved by the extension of
platforms on three sides of the loop would be of little conse-
quence, as each train must stop singly at the two Lake street
stations.

Counsel, in the argument, contended that the full five min-
utes could be saved by the trains skipping one station on the
Lake street side of the loop. The stations having been fixed
by the ordinance, it would seem to demand that all trains must
stop at all the stations.

But Mr. Arnold also says that the congestion on the loop
can be remedied by the roads using the loop making through
running arrangements with each other. Therefore, the ex-
tension of the platforms is not an absolute necessity, and if it
is to be presumed that while the council in passing the ordi-
nance took into consideration that the future growth of traffic
on the several railroads might require additional platform fa-
cilities, it must be also considered that the council knew that
in case the loop became congested, the railroads using the
loop, by agreement between themselves, could relieve that con-
gestion by making through running arrangements. It is pos-
sible that the latter consideration influenced the council in

not providing in express terms for the extension of platforms. It may also be presumed that the council took into consideration that with the growth of the city the travel on the surface tracks and on the surface of the street might also be congested, and did not intend to add to such surface congestion by authorizing further encroachments thereon by the elevated railroads.

There is no doubt but that the portion of the public using such elevated railroads or loops would be accommodated by such extensions of platforms and that the extensions would be useful and convenient to the patrons of the road and to the corporation, but so would platforms on both sides of the tracks for the entire circuit of the loop with exit stairs every half block be an accommodation, too, and useful and convenient to those who patronize the elevated roads, but the rights of the general public in the streets over and along which said elevated loop railroads are constructed and of abutting property owners are also to be considered in construing this ordinance. If platforms referred to in the permit were extended as demanded, Van Buren street, from the curb at Wabash avenue to the curb at Fifth avenue, or within a few feet of it, would have a covered way the entire distance of about sixteen hundred feet in length, the part thereof occupied by stations being two two-story structures which extend practically over the entire roadbed of the street and from lot line to lot line of Van Buren street and are included in such sixteen hundred feet. These extended platforms, one on each side of the street, would be ten feet in width and seven or more feet in height. The result would be to make Van Buren street, between Fifth avenue and Wabash avenue, dark, gloomy and unsanitary—practically a tunnel—because of the obstructions of the elevated structure thereon and the absence of sunlight and air. The platforms of the other streets would be extended to at least double their present length, and the result as to such other streets of the loop, namely, Wabash avenue, Fifth avenue and Lake street, embraced in this permit, would be substantially the same as Van Buren street.

The rule of the construction of these ordinances must clearly be that laid down by the United States supreme court, with regard to the construction of statutes. So far as the occupation of the street is concerned, the ordinance in question is similar in effect to a statute.

Statutes making grants to private corporations become subject, as regards the extent of the grant, to the universal rule that any doubtful points of construction shall be against the grantee and in favor of the public. *Oregon Railway & Navigation Co. v. Oregonian Ry. Co.*, 130 U. S. 1.

The court also cites the Charles River Bridge case, in the 11 Peters, 440, holding: "In this court the principle is recognized that in grants by the public, nothing passes by implication." Citing *Turnpike Co. v. Illinois*, 96 U. S. 63. "That a grant of franchise is to be construed most strongly against the donee and in favor of the public, and is not to be extended by implication."

This rule is recognized as applicable to railroads claiming rights in the streets of Chicago, by the case of *Chicago, D. & V. R. R. v. City of Chicago*, 121 Ill. 176, the principles of construction involved in said case being more pertinent to the case at bar than the cases relied upon by complainant.

A certain ordinance passed by the city of Chicago, after a careful mention and specification of the streets and alleys which might be used and crossed by the said road, contained a general clause giving the railroad authority "to lay down all such tracks, switches and turn-outs across any street and alley within the district aforesaid as may be necessary to the convenient use of any depot grounds said company now owns or may hereafter acquire in the vicinity and adjoining said line of road," and also to acquire and use such depot grounds, etc.

The company acquired freight depot grounds in the vicinity of the line of the road, and to reach the freight depot grounds built from the main track a spur which crossed—near said main line—a street called Ann, and then crossing Carroll avenue and North Curtis and North Carpenter streets.

The right to cross the streets named with this spur by virtue of the authority given by said general clause was challenged.

The supreme court say, after referring to the ordinance under which the railroad claimed the right to build this spur and cross the streets to reach the freight depot grounds: "Thus it will be seen that until this general clause in section 4 is reached, the authority which is given for the use of streets is specific, precise and most guardedly limited."

After quoting said general clause, the court holds: "There is no specific mention of streets in this general clause and to hold that under it any other streets might be used than those specified in the preceding part of the ordinance would make it indefinite and uncertain what streets might be made use of under this clause and leave it for the railroad company to determine. We do not think that was the intention of the common council, but it was their purpose to fix and limit precisely what streets might be used."

And that the true construction of the general clause was: "That it gave no authority in respect to the use of streets additional to what had been granted by the preceding part of the ordinance."

That, "under this general clause there was not given authority to make use of any other streets than those which the ordinance had specifically named might be used."

The elevated structure mentioned in the ordinances in question is described in great detail—except as to depots, platforms and stairs, "plans of which are to be approved by the commissioner of public works," thereby fixing and determining the part or quantity of the street that might be occupied by the elevated railroad, and to hold that by the use of the words "necessary platforms," in said section 7, it acquired a right to occupy more of the public street whenever increased travel on the road made it convenient or useful to the public, would be in opposition to the principle of construction laid down in said case of *Chi. D. & V. R. R. v. City of Chicago,* 121 Ill. 176. See also *People v. L. & N. R. R.,* 120 Ill. 48.

The rule of strict construction in favor of the public and

against the grantee of special rights or privileges in a public street is also recognized in *Snell v. City of Chicago,* 133 Ill. 413, in which the supreme court held that in the construction of such grants "they should be strictly construed in favor of the public and against the grantee of the privilege."

It must be constantly held in mind in construing these ordinances that the city does not own or control the streets as it does the engine stations or other property that it owns and controls. Its ownership and control of the streets is only as trustee and a trustee of limited powers.

As laid down in *Snell v. Chicago, ante:* "The fee of the streets is vested in the city for the use of the public and their free and untrammeled use belongs to the public."

This has been repeatedly held in this state. In *P., Ft. W. & C. v. Reich,* 101 Ill. 157, it is held that the ownership of the city is but nominal and is subordinate to the public trust for which the title is held. See also *Chicago v. Rumsey,* 87 Ill. 348.

And in the case of the *Chicago, Danville & Vincennes R. R. Co. v. City of Chicago, supra,* the court says: "The occupation of the streets of a city with a railroad track is of very serious concern, as regards the public and property owners upon the street, and a permission which is set up to so occupy a public street, should plainly appear, and not be left to be derived, by doubtful implication, from a generality of language which does not unmistakably manifest the intention to give such permission."

As was held in the *City of Chicago v. Wright,* 69 Ill. 318, 327, "The city has possession (of the streets) for the use of the public. The right of use is not limited exclusively to the citizens of Chicago, but the citizens of the state generally have an equal right with them in the appropriate enjoyment of the dedication. This was so held in *City of Alton v. Transportation Company,* 12 Ill. 60, and is a proposition that none can gainsay."

It must be borne in mind that the right of the public to the use of the streets is not confined to the surface of the streets. A street includes not only the portion of land between the

sidewalks, but the sidewalks also, and extends to the lot lines upon one side to the lot lines upon the other. It not only embraces the surface of the street between lot lines, but the earth beneath the surface and all above the surface between such lot lines. *McCormick v. South Park Com'rs.*, 150 Ill. 516.

The public have the right that God's sunlight and the breezes of heaven shall penetrate every part of such street, not only to the surface, but to all above the surface, and every encroachment upon such street, whether upon the surface or above the surface or below the surface, between such lot lines, is against the common right of the public—that the same shall be kept free and unobstructed.

While the surface railroad uses so much of the street as it occupies in common with the general public, to travel over, upon or across its track in a public street, the use and occupation of the street by an elevated railroad is not in common with the public, but is exclusive. That part of the street above the surface which it occupies is in its exclusive use and that part of the street which is necessary to support the structure is also in the exclusive occupation and for the benefit of the elevated road.

The structure in the street of a surface railroad and that of an elevated road are, as stated, so vitally different, that, in reason, the same rule of construction of ordinances granting the use of the street cannot be applicable to both, the occupation of a surface road being in common with the general public and the occupation of the elevated road being exclusive so far as it occupies the street. The construction of an ordinance as to powers granted the latter must not only be more strict than that of an ordinance granting powers to the former, but it must be held that different principles apply in making such construction.

In construing this grant to the elevated railroad, the character of the occupation granted to them must be kept in mind, and the *sui generis* character of such occupation. The city council was granting a right to build an elevated structure in a public street, every part of which structure was an in-

vasion of the common right of the public and of the private right of the abuttors. When you attempt to add to that structure by extending covered platforms seven to ten feet wide and seven feet or over in height, it is, as to such additions or extensions, in the nature of extending the franchise of the company as to the location of its structure and the extent of its occupation of the street. It is a taking from the public so much of the street as is occupied by the extension or addition, and is a damage to the property abutting on such extension or addition. It is not unlike in principle to a surface road attempting to extend its *termini* or right of way after having once located the same, as to which the authorities are to one effect, that it cannot do it without a new legislative grant. See *People v. L. & N. R. R.*, 120 Ill. 48; *P., Ft. W. & C. R. R. Co. v. Reich*, 101 Ill. 157; *Chicago, D. & V. R. R. v. Chicago, ante.*

I am satisfied, for the reasons stated, and upon the authorities cited, that the ordinances in question must be liberally construed in favor of the city and against the grantees in said ordinances.

Considering these railroads as elevated railroads and the peculiar character of their occupation of the public street, the situation and circumstances under which the grants were made, and the absence of any express grant of the right to extend their covered platforms, the ruling of the court must be that it was not the intention of the city council to grant to the said elevated roads by the said ordinances the right to make extensions of their platforms.

Also that the permit in question was issued by the commissioner of public works without the authority of the city council and was by him properly revoked.

In conclusion, as to the contention that the city has been receiving compensation for these grants to the elevated railroad companies, in the way of a percentage upon the receipts of travel upon the loop, and should be held to be estopped from interfering with the extension of the platform in question—such estoppel arising from an implied obligation not to do anything which would prevent an increase of revenue from

the operations of the "Loop,"—it is not necessary to pass upon the validity of the action by which—without any prior or subsequent approval of the council—the mayor compelled these loop railroads to agree to pay into the city treasury a percentage (ultimately reaching twenty-five per cent.) of the receipts of the use of the loop. I will only remark that I am strongly inclined to the opinion that the city is without power (even by the joint action of the mayor and aldermen) to sell or barter away any franchise in the public streets for a compensation to be paid into the city treasury.

While the city has the fee, it does not own the street as an individual owns his own property. It holds the fee and the control of the streets as a trustee for the public, and in its control of the streets its ownership is subordinate to its duties as trustee. It is not a trustee for the inhabitants of the city, but it is a trustee holding and controlling the streets for the public use. *P., Ft. W. & C. R. R. Co. v. Reich,* 101 Ill. 157, *ante.*

By the public, or public use, is meant the people of the whole state.

In the case of *Scholl v. The German Coal Company,* 118 Ill. 427, 432, the court says: "The expression 'public use' *ex vi termini,* implies an interest or right of some kind in the public and as the public can have no existence separate and apart from the people, of which it consists, it follows that its interest or right, whatever it is, belongs to and is vested in the people."

The city, as a public trustee, is subject to the rule applying to all trustees, whether individuals or corporations, and that is that a trustee cannot control trust property for his or its own benefit.

In the case of the *City of Alton v. Illinois Transportation Company,* 12 Ill. 60, our supreme court say, in an action of ejectment brought by the city of Alton to try the right of the public to a certain piece of land as public highway dedicated to public use: "Whatever title these public grounds may be vested in the city, she has not the unqualified control and disposition of them. They were dedicated to the public for the particular purposes and only for such purposes can

they be rightfully used. For those purposes the city may improve and control them and adopt all needful rules and regulations for their management and use, but she cannot alienate or otherwise dispose of them for her own exclusive benefit nor are they subject to the payment of her debts. At most, she but holds them in trust for the benefit of the public. The right to the use of the property is not limited exclusively to the citizens of Alton, but the citizens of the state generally have an equal right with them in the appropriate enjoyment of the dedication.'' See also *City of Chester v. R. R. Co.*, 182 Ill. 382; *Ligare v. City of Chicago*, 139 Ill. 46; *P., Ft. W. & C. R. Co. v. Reich,* 101 Ill. 157.

It follows that if this agreement for compensation to the city treasury was *ultra vires,* no estoppel can be placed upon the city for its action under an *ultra vires* contract The city has power to exact a reasonable license fee for compensation for the extra cost it may be put to and the supervision and the use of its police made necessary by such use of its streets, but it cannot speculate or make money for its treasury —or its taxpayers—out of its exercise of the power to control the public streets as a trustee for the public.

During the argument I held that the contention of the city as to the invalidity of these ordinances did not arise necessarily upon the motion for a temporary injunction against the commissioner of public works. For that reason, I have not discussed the contention of the city that the elevated railroads have no right to the relief asked for, because no one of them has built its road for the entire *termini* of the grant—the Wabash avenue has not been built to Harrison nor the Van Buren to within two hundred feet of Halsted, nor the Northwestern and Fifth avenue grant has not been completed south of Van Buren street. Whether the (ordinance) grant to these railroads is subject to forfeiture—whether they can split their franchises—cannot be determined without proof as to the petitions to the common council upon which such grants were purported to have been made. The ordinances appear to be valid upon their face. The petitions are not before the court, nor is it necessary to determine the contention of the

city that there is no power conferred by the ordinances to build station houses in the public streets or to use such station houses for traffic in merchandise as alleged. These and other defenses set up by the city, cannot, as before stated, be de-decided upon this hearing.

The only question decided is that the elevated railroads in question have no right, under the respective ordinances granted them, to extend the platforms upon their respective lines without some further grant by the city council; that the permit in question was issued by the commissioner of public works without authority of law and was properly revoked.

The motion for temporary injunction will be denied.